ASGROW SEED COMPANY,
Plaintiff–Appellee,

v.

Denny WINTERBOER and Becky
Winterboer, d/b/a Deebee's,
Defendants–Appellants.

No. 92–1048.

United States Court of Appeals,
Federal Circuit.

March 25, 1993.

Opinion of Circuit Judge Rader
Concurring in Denial of Rehearing
En Banc March 29, 1993.

Opinion of Circuit Judge Newman
Dissenting from Denial of Rehearing
En Banc March 25, 1993.

Richard L. Stanley and John F. Lynch, Arnold, White & Durkee, Houston, TX, were on the Petition for Rehearing and Suggestion for Rehearing En Banc, filed by plaintiff-appellee. Also on the petition were Bruce Stein, Robert A. Armitage and Sidney B. Williams, Jr., The UpJohn Co., Kalamazoo, MI, and Lawrence C. Maxwell, Trabue, Sturdivant and Dewitt, Nashville, TN.

William H. Bode and Robert A. Jaffe, William H. Bode & Associates, Washington, DC, were on the defendants-appellants response to plaintiff-appellee's Petition for Rehearing and Suggestion for Rehearing En Banc.

ORDER

A combined petition for rehearing and suggestion for rehearing in banc having been filed by the APPELLEE, and a response thereto having been invited by the court and filed by the APPELLANT, and the petition for rehearing having been referred to the panel that heard the appeal, and thereafter the suggestion for rehear-ing in banc and response having been referred to the circuit judges who are in regular active service,

UPON CONSIDERATION THEREOF, it is

ORDERED that the petition for rehearing be, and the same hereby is, DENIED, and it is further

ORDERED that the suggestion for rehearing in banc be, and the same hereby is, DECLINED.

The mandate of the court will issue on April 2, 1993.

Chief Judge NIES, Circuit Judge NEWMAN, Circuit Judge ARCHER, Circuit Judge MICHEL and Circuit Judge PLAGER would rehear the appeal in banc.

RADER, Circuit Judge, concurring in the denial of rehearing en banc.

[Filed March 29, 1993]

Because *Asgrow Seed Co. v. Winterboer*, No. 92–1048 (Fed.Cir. Dec. 21, 1992), correctly interpreted the Plant Variety Protection Act, this court properly declined to rehear the case *en banc*. The Act has a vital and important purpose:

> to provide *the indicated protection* for new varieties ... so as to afford adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties.

7 U.S.C. § 2581 (1988) (emphasis added). This court in *Asgrow* acknowledged and respected that purpose.

Section 2543, the crop exemption, helps define "the indicated protection" of the Act. The exemption permits farmers to save, use, and sell seed. 7 U.S.C. § 2543 (1988). The exemption specifically excludes (and thus farmers may not engage in) sexually multiplying seed as a step in marketing. 7 U.S.C. § 2541(3) (1988).

As used in the Act, marketing is not simply selling. The Act uses both words.*

---

* The same section of the Act that prohibits "sexually multiply[ing] the novel variety as a step in marketing" also prohibits separately "sell[ing] the novel variety, or offer[ing] it for sale." 7

The Act prohibits "sexually multiply[ing] the novel variety as a step in marketing." *Id.* The Act permits, under specified circumstances, selling. 7 U.S.C. § 2543. The Act states:

> [I]t shall not infringe any right hereunder for a person to save seed ... for sale as provided in this section....

*Id.* Indeed if selling and marketing were synonymous, then much of the crop exemption would have no meaning. The Act, however, includes a crop exemption to permit farmers to make brown bag sales.

The district court erred in reading an ensuing crop limitation into the crop exemption. The Act does not limit the amount of seed a farmer may sell to the amount necessary to plant another crop. The Act does not say a farmer may sell seed "saved ... for seeding purposes." The Act says a farmer may sell seed "produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes." *Id.* Under normal rules of syntax, "for seeding purposes" modifies "obtained." Three different clauses of the crop exemption feature the words "for seeding purposes" as modifiers of "obtained." At no place in the exemption does "for seeding purposes" modify "saved."

PAULINE NEWMAN, Circuit Judge, dissenting from denial of the suggestion for rehearing en banc.

[Filed March 25, 1993]

The panel's interpretation of the "farmer's exemption" provision of the Plant Variety Protection Act is of first impression in this court. The panel, reversing the district court, 982 F.2d 486, has reached an interpretation of this provision that is contrary to the statute and its purpose.

The importance of the issue merits the attention of the full court, for it is not too dramatic to observe that this ruling nullifies the Plant Variety Protection Act as an incentive for innovation in agriculture. If this statutory construction is to be adopted, it should be done *en banc.*

*Statutory Interpretation*

The legislative purpose was uncontroversial, and unambiguously recorded:

> to encourage the development of novel varieties of sexually reproduced plants and to make them available to the public, providing protection available to those who breed, develop, or discover them, and thereby promoting progress in agriculture in the public interest, ...

H.R.Rep. No. 1605, 91st Cong., 2d Sess., at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5082, 5082. This purpose was not limited to expression in the legislative history; it was enacted in the statute itself:

> 7 U.S.C. § 2581 It is the intent of Congress to provide the indicated protection for new varieties by exercise of any constitutional power needed for that end, so as to afford adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties.

Before enactment of the Plant Variety Protection Act in 1970, developers of sexually reproduced plants (plants grown from seed) were by statute excluded from patent protection, whereas asexually reproduced plants (propagated, *e.g.,* by grafting) were covered by Chapter 15 of the Patent Act. Without some form of protection against reproduction and sale of the seed, developers of new varieties of seed-propagated plants could not recapture their often-extensive research and development costs. Thus the financial incentive for innovation in new varieties in agriculture was absent. The twelve briefs of *amici curiae,* apparently representing the entire seed industry, report how little R & D was done by private enterprise on seed-propagated plants.[1]

U.S.C. § 2541(1), (3). Selling is different from marketing. Although the selling subsection is subject to the crop exemption, the marketing subsection is not. Section 2543 makes this distinction precisely because the crop exemption permits, under specified circumstances, brown bag selling.

1. For example, *amicus curiae* Agripro Biosciences Inc. states that its new product research program, with 111 full time employees and an

The *amici* discuss the problems of taxpayer-supported (USDA) plant variety breeding for lack of marketing resources, and the purpose of the Act to obtain industry involvement.

The Plant Variety Protection Act was intended to invigorate industrial development of new varieties, in the national interest. This was designed to be achieved by providing limited exclusivity to the plant breeder:

> 7 U.S.C. § 2483 [A certificate of plant variety protection gives the breeder the right] to exclude others from selling the variety, or offering it for sale, or reproducing it, or importing it, or exporting it, or using it in producing (as distinguished from developing) a hybrid or different variety therefrom....

The Plant Variety Protection Act provided a measure of control to the commercial developer of a new plant variety, and thus provided the incentive to such development. Upon meeting the requirements of the Act, the plant breeder had the right to exclude others from reproducing or selling the seed for reproductive purposes, with the pragmatic exception that farmers could continue the practice of saving enough seed from one crop to plant the next.

The Act was not designed to permit farmers to grow and sell seed of certified varieties as a business, to enter the commercial seed business in competition with the creator of the new variety.[2] The panel majority, by allowing up to half of a farmer's crop to be sold as seed, authorizes this practice, in a travesty of statutory interpretation.

The statute was not designed to place farmers in the seed business; it was designed to strengthen American agriculture by improving the quality and yield of crops for purposes of nutrition and value to the consumer, and to aid in international competitiveness.

### The Crop Exemption

The Act permits the sale of seeds for non-reproductive purposes such as food, animal feed, or in the production of industrial products such as oil or ethanol. The Act also exempts certain shipping, research, and farming activities from some provisions of the act. The "crop exemption" or "farmer's exemption" is the focus of this lawsuit.

The farmer's exemption permits farmers to continue their usual practice of saving part of their crop as seed for replanting on their farms, and to use seed crops for non-reproductive purposes such as animal feed. The exemption also permits a farmer who does not use the saved seed himself to sell it to another farmer, provided that neither farmer is in the seed business. The issue in this case is whether the statute permits more than this limited amount of sale of certified seed. I believe that the panel erred in its interpretation of the relevant provision:

> 7 U.S.C. § 2543 **Right to save seed; crop exemption**
>
> Except to the extent that such action may constitute an infringement under subsections (3) and (4) of section 2541 of this title, it shall not infringe any right hereunder for a person to save seed produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on his farm, or for sale as provided in this sec-

annual expenditure of six million dollars, "came into existence only after the enactment of the Plant Variety Protection Act", and that development of a new variety takes 8 to 12 years.

Agripro states that it now markets 28 varieties of wheat, all developed in its laboratories after the enactment, and estimates that in the nation over 3,000 new crop varieties have been developed in programs that began after enactment of the Plant Variety Protection Act, as compared with 150 new varieties in the ten years before enactment.

**2.** According to *amicus curiae* Jacob Hartz Seed Co., a single bushel of soybean seed will produce between 25 and 45 bushels of soybeans. If only half of the crop is sold as seed in successive years, in three years this would allow the farmer to place on the market between 2,037 and 11,655 bushels of seed. The amicus American Seed Trade Association calculated that a single soybean seed, after three crops, would produce 27,000 seeds.

tion: *Provided,* That without regard to the provisions of section 2541(3) of this title it shall not infringe any right hereunder for a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such saved seed to other persons so engaged, for reproductive purposes, provided such sale is in compliance with such State laws governing the sale of seed as may be applicable. A bona fide sale for other than reproductive purposes, made in channels usual for such other purposes, of seed produced on a farm either from seed obtained by authority of the owner for seeding purposes or from seed produced by descent on such farm from seed obtained by authority of the owner for seeding purposes shall not constitute an infringement. A purchaser who diverts seed from such channels to seeding purposes shall be deemed to have notice under section § 2567 of this title that his actions constitute an infringement.

There is no dispute that farmers may save seed for their own use, harvested from crops grown from legitimately obtained seed of protected varieties. The statement in § 2543 that a person may "save seed produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes" establishes the category of "saved seed", to which the statute subsequently refers ("such saved seed"). According to § 2543 this saved seed may be used "in the production of a crop for use on his farm, or for sale as provided in this section". Thus we reach the questions of whether the seed the Winterboers sold qualified as "saved seed" and, if so, did they sell more of it than the statute permits.

The first clause of § 2543 provides that the crop exemption does not apply to activities that infringe pursuant to subsections (3) and (4) of section 2541. Section 2541(3)

is one of eight enumerated acts that infringe a certificate owner's rights:

> **7 U.S.C. § 2541.** ... it shall be an infringement of the rights of the owner of a novel variety to perform without authority, any of the following acts ...
>
> \* \* \* \* \* \*
>
> (3) sexually multiply the novel variety as a step in marketing (for growing purposes) the variety ...

Thus the crop exemption of § 2543 does not apply to a novel variety that is sexually multiplied as a step in marketing the variety for growing purposes. Crops grown to be marketed as seed are an infringement, by § 2541(3). Thus crops grown to be marketed as seed are excluded from the crop exemption.

The panel opinion draws a distinction between the word "marketing", as used in § 2541(c), and sales under the crop exemption, apparently believing that the Winterboers may sell their crop as seed as long as they do not "market" it (by engaging in ancillary activities such as advertising). This is a curious construction, for although the niceties of language can always tempt the aficionado, in this case there is no basis for departing from the ordinary, contemporary, common meaning of "marketing" as "selling".[3] Unless otherwise defined the words in a statute are given their ordinary, contemporary, common meaning. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (citing *Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184–85, 43 L.Ed.2d 469 (1975)). There is no basis for the panel's conclusion that Congress silently intended "marketing" to be limited to "extensive or coordinated selling activities", and thus to be different from "selling".

The Winterboers planted 265 acres of certified soybean varieties, and sold the entire usable crop, 10,529 bushels, as seed; enough to plant 10,000 acres. It is undis-

---

**3.** The dictionary defines the verb form of "market" as synonymous with "sell". *E.g.,* Webster's Ninth New Collegiate Dictionary (Merriam–Webster, 1984) ("**market** *vi* (1635): to deal in a market [-] *vt* 1: to expose for sale in a market 2: SELL"); Webster's Third New International dictionary (Merriam–Webster, 1976) ("*vt* 1: to expose for sale in a market: traffic in: sell in a market 2: SELL"). [Capital letters indicate a synonym.]

puted that the Winterboers grew this soybean crop primarily for sale as seed. As discussed *supra,* growing a crop for seed involves "sexually multiplying the novel variety as a step in marketing (for growing purposes) the variety". Their activity thus infringed Asgrow's rights under § 2541(3). Applying the first clause of § 2543, the seed the Winterboers sold did not qualify as saved seed, hence its sale was not permitted pursuant to the crop exemption. No other section of the Act authorizes the Winterboers' sale of seed for reproductive purposes.

The district court held, applying § 2543, that the amount of seed that may be sold is limited to the amount permitted to be "saved ... for seeding purposes", and that the amount of seed that could be saved for seeding purposes was limited to what would be necessary for the ensuing crop planting "on his farm", quoting from § 2543. The panel holds that the farmer may sell up to half of the crop as seed, stating that the only limit is whether the "primary farming occupation is the growing of crops for sale for other than reproductive purposes". The panel has misinterpreted this text, for this provision is directed to whether a farmer may sell *any* saved seed, not how much seed the farmer may sell.

To qualify for the crop exemption, the seed must not have been grown for the purpose of sale as seed (§ 2541(3)). When a farmer saves only enough seed to replant the crop on the farm, and then forgoes such replanting, it may be inferred that such seed is "saved seed", and may be sold. If the farmer wishes to sell more, he must establish that the seed was grown and saved for use other than for sale as seed (*e.g.,* for animal feed). The farmer who sells more seed of a certified variety than

he could have planted on his farm has a long row to hoe in proving that the crop was not grown for sale as seed.

The House Report pertaining to § 2543 states:

This section authorizes a farmer to sell the crop produced from a protected variety for other than reproductive purposes, to save seed from such crop for future use or planting on the farm; or, if his primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such seed for reproductive purposes to other persons so engaged.

H.R.Rep. No. 1605, *supra,* at 11, *reprinted in* 1970 U.S.C.C.A.N. at 5093. This explains the farmer's options under the crop exemption: the crop may be sold for purposes other than use as seed; seed may be saved for future use or planting by the farmer; or such saved seed may be sold to other farmers for use as seed.[4]

The discontinued research projects and abandoned varieties due to massive "brown bag" sales, reported in detail by various *amici curiae,* may not interest farmers such as the Winterboers, who have opportunistically entered the seed business for certified varieties. It is the greater national interest that suffers from this eviscerated incentive to innovate in plant varieties. New disease resistant crops, for example, may lower food costs and be more competitive in international trade; but they may be of less short term impact on individual farmers.

If a statute is "insufficiently precise", it is the court's obligation to serve the statutory purpose. *United States v. Bacto-Unidisk,* 394 U.S. 784, 799, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969) (citing *S.E.C. v. Ralston Purina Co.,* 346 U.S. 119, 124–25,

---

4. Witnesses in the hearings before both the House and Senate committees responded to questions from members with the assurance that the proposed legislation would permit farmers to save seed to replant their crops or for other use on the farm, but that the farmers could not sell this seed to others for use as seed. No witness argued that farmers should have greater rights to sell certificated crop seeds. *See generally Plant Variety Protection Act: Hearings*

*on S. 3070 Before the Subcommittee on Agricultural Research and General Legislation of the Senate Committee on Agriculture and Forestry,* 91st Cong., 2d Sess. (1970); *Plant Variety Protection: Hearings on H.R. 13424, H.R. 13631, H.R. 13658, H.R. 13901, H.R. 14332, and H.R. 15226 Before the Subcommittee on Departmental Operations of the House of Representatives Committee on Agriculture,* 91st Cong., 2d Sess. (1970).

73 S.Ct. 981, 984–85, 97 L.Ed. 1494 (1953)). This statute was designed to permit continuation of the historical practice of farmers to save seed for their own use, with occasional minor transactions with neighbors on this saved seed. The statute does not authorize the farmer to go into the commercial seed business with half of each crop of certified variety. Instead of resolving an ungainly statute in a way so facially contrary to its purpose, at a minimum the court should rehear the case, with adequate participation from the *amici* and with full briefing of these issues.