# ASGROW SEED CO. *v.* WINTERBOER ET AL., DBA DEEBEES

No. 92–2038.   Argued November 7, 1994—Decided January 18, 1995

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 193.

*Richard L. Stanley* argued the cause for petitioner. With him on the briefs were *John F. Lynch, Bruce Stein, Lawrence C. Maxwell,* and *Mary Ellen Morris.*

*Richard H. Seamon* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Barbara C. Biddle,* and *Wendy M. Keats.*

*William H. Bode* argued the cause for respondents. With him on the brief was *Luis M. Acosta.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the American Intellectual Property Law Association by *J. Michael Jakes;* and for the American Seed Trade Association by *Gary Jay Kushner, John G. Roberts, Jr.,* and *David G. Leitch.*

*Mary Helen Sears* filed a brief for Ted Cook as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Rural Advancement Foundation International et al. by *David Charles Masselli;* and for James G. McDonald by *Stephen Gordon.*

JUSTICE SCALIA delivered the opinion of the Court.

The Plant Variety Protection Act of 1970, 7 U. S. C. §2321 *et seq.,* protects owners of novel seed varieties against unauthorized sales of their seed for replanting purposes. An exemption, however, allows farmers to make some sales of protected variety seed to other farmers. This case raises the question whether there is a limit to the quantity of protected seed that a farmer can sell under this exemption.

I

In 1970, Congress passed the Plant Variety Protection Act (PVPA), 84 Stat. 1542, 7 U. S. C. §2321 *et seq.,* in order to provide developers of novel plant varieties with "adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties," §2581. The PVPA extends patent-like protection to novel varieties of sexually reproduced plants (that is, plants grown from seed) which parallels the protection afforded asexually reproduced plant varieties (that is, varieties reproduced by propagation or grafting) under Chapter 15 of the Patent Act. See 35 U. S. C. §§161–164.

The developer of a novel variety obtains PVPA coverage by acquiring a certificate of protection from the Plant Variety Protection Office. See 7 U. S. C. §§2421, 2422, 2481–2483. This confers on the owner the exclusive right for 18 years to "exclude others from selling the variety, or offering it for sale, or reproducing it, or importing it, or exporting it, or using it in producing (as distinguished from developing) a hybrid or different variety therefrom." §2483.

Petitioner, Asgrow Seed Company, is the holder of PVPA certificates protecting two novel varieties of soybean seed, which it calls A1937 and A2234. Respondents, Dennis and Becky Winterboer, are Iowa farmers whose farm spans 800 acres of Clay County, in the northwest corner of the

State. The Winterboers have incorporated under the name "D-Double-U Corporation" and do business under the name "DeeBee's Feed and Seed." In addition to growing crops. for sale as food and livestock feed, since 1987 the Winterboers have derived a sizable portion of their income from "brown-bag" sales of their crops to other farmers to use as seed. A brown-bag sale occurs when a farmer purchases seed from a seed company, such as Asgrow, plants the seed in his own fields, harvests the crop, cleans it, and then sells the reproduced seed to other farmers (usually in nondescript brown bags) for them to plant as crop seed on their own farms. During 1990, the Winterboers planted 265 acres of A1937 and A2234, and sold the entire salable crop, 10,529 bushels, to others for use as seed—enough to plant 10,000 acres. The average sale price was $8.70 per bushel, compared with a then-current price of $16.20 to $16.80 per bushel to obtain varieties A1937 and A2234 directly from Asgrow.

Concerned that the Winterboers were making a business out of selling its protected seed, Asgrow sent a local farmer, Robert Ness, to the Winterboer farm to make a purchase. Mr. Winterboer informed Ness that he could sell him soybean seed that was "just like" Asgrow varieties A1937 and A2234. Ness purchased 20 bags of each; a plant biologist for Asgrow tested the seeds and determined that they were indeed A1937 and A2234.

Asgrow brought suit against the Winterboers in the Federal District Court for the Northern District of Iowa, seeking damages and a permanent injunction against sale of seed harvested from crops grown from A1937 and A2234. The complaint alleged infringement under 7 U. S. C. § 2541(1), for selling or offering to sell Asgrow's protected soybean varieties; under § 2541(3), for sexually multiplying Asgrow's novel varieties as a step in marketing those varieties for growing purposes; and under § 2541(6), for dispensing the novel varie-

ties to others in a form that could be propagated without providing notice that the seeds were of a protected variety.[1]

The Winterboers did not deny that Asgrow held valid certificates of protection covering A1937 and A2234, and that they had sold seed produced from those varieties for others to use as seed. Their defense, at least to the §§ 2541(1) and

---

[1] At the time the infringement action was filed, § 2541 provided in full:

"Except as otherwise provided in this subchapter, it shall be an infringement of the rights of the owner of a novel variety to perform without authority, any of the following acts in the United States, or in commerce which can be regulated by Congress or affecting such commerce, prior to expiration of the right to plant variety protection but after either the issue of the certificate or the distribution of a novel plant variety with the notice under section 2567 of this title:

"(1) sell the novel variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit an offer to buy it, or any other transfer of title or possession of it;

"(2) import the novel variety into, or export it from, the United States;

"(3) sexually multiply the novel variety as a step in marketing (for growing purposes) the variety; or

"(4) use the novel variety in producing (as distinguished from developing) a hybrid or different variety therefrom; or

"(5) use seed which had been marked "Unauthorized Propagation Prohibited" or "Unauthorized Seed Multiplication Prohibited" or progeny thereof to propagate the novel variety; or

"(6) dispense the novel variety to another, in a form which can be propagated, without notice as to being a protected variety under which it was received; or

"(7) perform any of the foregoing acts even in instances in which the novel variety is multiplied other than sexually, except in pursuance of a valid United States plant patent; or

"(8) instigate or actively induce performance of any of the foregoing acts."

In October 1992, Congress amended § 2541, designating the prior text as subsection (a) and adding a subsection (b), the provisions of which are not relevant here. Curiously, however, the references in § 2543 to the infringement provisions of § 2541 were not amended to reflect this change. For clarity's sake, therefore, we will continue to refer to the infringement provisions under their prior designations, e. g., §§ 2541(1)–(8), rather than their current designations, e. g., §§ 2541(a)(1)–(8).

(3) charges, rested upon the contention that their sales fell within the statutory exemption from infringement liability found in 7 U. S. C. § 2543. That section, entitled "Right to save seed; crop exemption," reads in relevant part as follows:

"Except to the extent that such action may constitute an infringement under subsections (3) and (4) of section 2541 of this title, it shall not infringe any right hereunder for a person to save seed produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on his farm, or for sale as provided in this section: *Provided*, That without regard to the provisions of section 2541(3) of this title it shall not infringe any right hereunder for a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such saved seed to other persons so engaged, for reproductive purposes, provided such sale is in compliance with such State laws governing the sale of seed as may be applicable. A bona fide sale for other than reproductive purposes, made in channels usual for such other purposes, of seed produced on a farm either from seed obtained by authority of the owner for seeding purposes or from seed produced by descent on such farm from seed obtained by authority of the owner for seeding purposes shall not constitute an infringement. . . ."[2]

---

[2] Congress has recently amended this section by striking from the first sentence the words " 'section: *Provided*, That' and all that follows through the period and inserting 'section.' " Plant Variety Protection Act Amendments of 1994, Pub. L. 103–349, 108 Stat. 3136, 3142. That amendment has the effect of eliminating the exemption from infringement liability for farmers who sell PVPA-protected seed to other farmers for reproductive purposes. That action, however, has no bearing on the resolution of the

The Winterboers argued that this language gave them the right to sell an unlimited amount of seed produced from a protected variety, subject only to the conditions that both buyer and seller be farmers "whose primary farming occupation is the growing of crops for sale for other than reproductive purposes," and that all sales comply with state law. Asgrow maintained that the exemption allows a farmer to save and resell to other farmers only the amount of seed the seller would need to replant his own fields—a limitation that the Winterboers' sales greatly exceeded. The District Court agreed with Asgrow and granted summary judgment in its favor. 795 F. Supp. 915 (1991).

The United States Court of Appeals for the Federal Circuit reversed. 982 F. 2d 486 (1992). Although "recogniz[ing] that, without meaningful limitations, the crop exemption [of § 2543] could undercut much of the PVPA's incentives," *id.*, at 491, the Court of Appeals saw nothing in § 2543 that would limit the sale of protected seed (for reproductive purposes) to the amount necessary to plant the seller's own acreage. Rather, as the Court of Appeals read the statute, § 2543 permits a farmer to sell up to half of every crop he produces from PVPA-protected seed to another farmer for use as seed, so long as he sells the other 50 percent of the crop grown from that specific variety for nonreproductive purposes, *e. g.*, for food or feed. The Federal Circuit denied Asgrow's petition for rehearing and suggestion for rehearing en banc by a vote of six judges to five. 989 F. 2d 478 (1993). We granted certiorari. 511 U. S. 1029 (1994).

II

It may be well to acknowledge at the outset that it is quite impossible to make complete sense of the provision at issue

present case, since the amendments affect only those certificates issued after April 4, 1995, that were not pending on or before that date. See *id.*, §§ 14(a), 15, 108 Stat. 3144, 3145.

here. One need go no further than the very first words of its title to establish that. Section 2543 does *not*, as that title claims and the ensuing text says, reserve any "[r]ight to save seed"—since nothing elsewhere in the Act remotely prohibits the saving of seed. Nor, under any possible analysis, is the proviso in the first sentence of § 2543 ("*Provided,* That") really a proviso.

With this advance warning that not all mysteries will be solved, we enter the verbal maze of § 2543. The entrance, we discover, is actually an exit, since the provision begins by excepting certain activities from its operation: "*Except to the extent that such action may constitute an infringement under subsections (3) and (4) of section 2541 of this title,* it shall not infringe any right hereunder for a person to save seed produced by him . . . and use such saved seed in the production of a crop for use on his farm, or for sale as provided in this section . . . ." (Emphasis added.) Thus, a farmer does not qualify for the exemption from infringement liability if he has

> "(3) sexually multipl[ied] the novel variety as a step in marketing (for growing purposes) the variety; or
>
> (4) use[d] the novel variety in producing (as distinguished from developing) a hybrid or different variety therefrom." 7 U. S. C. §§ 2541(3)–(4).

In 1990, the Winterboers planted 265 acres of Asgrow protected variety seed and collected a harvest of 12,037 bushels of soybeans. The parties do not dispute that this act of planting and harvesting constituted "sexual multiplication" of the novel varieties. See 7 U. S. C. § 2401(f) (defining "sexually reproduced" seed to include "any production of a variety by seed"). The Winterboers sold almost all of these beans for use as seed (*i. e.,* "for growing purposes"), without Asgrow's consent. The central question in this case, then, is whether the Winterboers' planting and harvesting were conducted "as a step in marketing" Asgrow's protected seed

varieties for growing purposes. If they were, the Winterboers were not eligible for the § 2543 exemption, and the District Court was right to grant summary judgment to Asgrow.

The PVPA does not define "marketing." When terms used in a statute are undefined, we give them their ordinary meaning. *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994). The Federal Circuit believed that the word "marketing" requires "extensive or coordinated selling activities, such as advertising, using an intervening sales representative, or similar extended merchandising or retail activities." 982 F. 2d, at 492. We disagree. Marketing ordinarily refers to the act of holding forth property for sale, together with the activities preparatory thereto (in the present case, cleaning, drying, bagging, and pricing the seeds). The word does not require that the promotional or merchandising activities connected with the selling be extensive. One can market apples by simply displaying them on a cart with a price tag; or market a stock by simply listing it on a stock exchange; or market a house (we would normally say "place it on the market") by simply setting a "for sale" sign on the front lawn. Indeed, some dictionaries give as one meaning of "market" simply "to sell." See, *e. g.*, Oxford Universal Dictionary 1208 (3d ed. 1955); Webster's New International Dictionary 1504 (2d ed. 1950). Of course, effective selling often involves extensive promotional activities, and when they occur they are all part of the "marketing." But even when the holding forth for sale relies upon no more than word-of-mouth advertising, a marketing of goods is in process. Moreover, even if the word "marketing" could, in one of its meanings, demand extensive promotion, we see no reason why the law at issue here would intend that meaning. That would have the effect of preserving PVPA protection for less valuable plant varieties, but eliminating it for varieties so desirable that they can be marketed by word of mouth; as well as the effect of requiring courts to ponder the difficult question of how much promotion is necessary to constitute marketing. We

think that when the statute refers to sexually multiplying a variety "as a step in marketing," it means growing seed of the variety for the purpose of putting the crop up for sale.[3] Under the exception set out in the first clause of § 2543, then, a farmer is not eligible for the § 2543 exemption if he plants and saves seeds for the purpose of selling the seeds that they produce for replanting.

Section 2543 next provides that, so long as a person is not violating either §§ 2541(3) or (4),

> "it shall not infringe any right hereunder for a person to *save seed* produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use *such saved seed* in the production of a crop for use on his farm, or for sale as provided in this section . . . ." (Emphasis added.)

Farmers generally grow crops to sell. A harvested soybean crop is typically removed from the farmer's premises in short order and taken to a grain elevator or processor. Sometimes, however, in the case of a plant such as the soybean, in which the crop is the seed, the farmer will have a portion of his crop cleaned and stored as seed for replanting his fields next season. We think it clear that this seed *saved for replanting* is what the provision under discussion means by

---

[3] The dissent asserts that the Federal Circuit's more demanding interpretation of "marketing" is supported by the ancient doctrine disfavoring restraints on alienation of property, see *post*, at 194–195. The wellspring of that doctrine, of course, is concern for property rights, and in the context of the PVPA it is the dissent's interpretation, rather than ours, which belittles that concern. The whole purpose of the statute is to create a valuable property in the product of botanical research by giving the developer the right to "exclude others from selling the variety, or offering it for sale, or reproducing it, or importing it, or exporting it," etc. 7 U. S. C. § 2483. Applying the rule disfavoring restraints on alienation to interpretation of the PVPA is rather like applying the rule disfavoring restraints upon freedom of contract to interpretation of the Sherman Act.

"saved seed"—not merely regular uncleaned crop that is stored for later market sale or use as fodder.

There are two ways to read the provision, depending upon which words the phrase "for sale as provided in this section" is taken to modify. It can be read "production of a crop . . . for sale as provided in this section"; or alternatively "use such saved seed . . . for sale as provided in this section." The parallelism created by the phrase "*for* use on his farm" followed immediately by "or *for* sale as provided in this section" suggests the former reading. But the placement of the comma, separating "use [of] such saved seed in the production of a crop for use on his farm," from "or for sale," favors the latter reading. So does the fact that the alternative reading requires the reader to skip the lengthy "*Provided,* That" clause in order to find out what sales are "provided [for] in this section"—despite the parallelism between "provided" and "*Provided,*" and despite the presence of a colon, which ordinarily indicates specification of what has preceded. It is surely easier to think that at least some of the sales "provided for" are those that are "Provided" after the colon. (It is, of course, not unusual, however deplorable it may be, for "Provided, That" to be used as prologue to an addition rather than an exception. See *Springer* v. *Philippine Islands,* 277 U. S. 189, 206 (1928); 1A N. Singer, Sutherland on Statutory Construction § 20.22 (5th ed. 1992).)

We think the latter reading is also to be preferred because it lends greater meaning to all the provisions. Under the former reading ("production of a crop . . . for sale as provided in this section"), the only later text that could be referred to is the provision for "bona fide sale[s] for other than reproductive purposes" set out in the second sentence of § 2543—the so-called "crop exemption." (The proviso could *not* be referred to, since it does not provide for sale of *crops* grown from saved seed, but only for sale of saved seed itself.) But if the "or for sale" provision has such a limited referent, the opening clause's ("Except to the extent that . . .") reservation

of § 2541(3) infringement liability (*i. e.*, liability for growing as a step in marketing for reproductive purposes) would be devoid of content, since the provision to which it is attached would *permit* no sales for reproductive purposes. Under the latter reading, by contrast, the farmer may not "use [his] saved seed . . . for sale" as the proviso allows *if* the seed was intentionally grown for the purpose of such sale—*i. e.*, "sexually multipl[ied] . . . as a step in marketing (for growing purposes) the variety."[4] A second respect in which our favored reading gives greater meaning to the provision is this: The other reading ("crop . . . for sale as provided in this section") causes the "permission" given in the opening sentence to extend only to sales for nonreproductive purposes of the *crops grown* from saved seed, as opposed to sales of the saved seed itself. But no separate permission would have been required for this, since it is already contained within the crop exemption itself; it serves only as a *reminder* that crop from saved seed can be sold under that exemption—a peculiarly incomplete reminder, since the saved seed *itself* can also be sold under that exemption.

To summarize: By reason of its proviso the first sentence of § 2543 allows seed that has been preserved for reproductive purposes ("saved seed") to be sold for such purposes. The structure of the sentence is such, however, that this authorization does *not* extend to saved seed that was grown *for the very purpose* of sale ("marketing") for replanting—because in that case, § 2541(3) would be violated, and the above-

---

[4] This reading also gives meaning to the proviso's statement that "*without regard to* the provisions of section 2541(3) . . . it shall not infringe any right hereunder" for a person to engage in certain sales of saved seed for reproductive purposes (emphasis added). This serves to eliminate the technical argument that a production of seed that was originally in compliance with § 2541(3) (because it was not done as a step in marketing for reproductive purposes) could retroactively be rendered unlawful by the later sale permitted in the proviso, because such sale *causes* the earlier production to have been "a step in the marketing" for reproductive purposes.

discussed exception to the exemption would apply. As a practical matter, since § 2541(1) prohibits all unauthorized transfer of title to, or possession of, the protected variety, this means that the only seed that can be sold under the proviso is seed that has been saved by the farmer to replant his own acreage.[5] (We think that limitation is also apparent from the text of the crop exemption, which permits a farm crop from saved seeds to be sold—for nonreproductive purposes—only if those saved seeds were "produced by descent *on such farm.*" (Emphasis added.) It is in our view the proviso in § 2543, and not the crop exemption, that authorizes the permitted buyers of saved seeds to sell the crops they produce.) Thus, if a farmer saves seeds to replant his acreage, but for some reason changes his plans, he may instead sell those seeds for replanting under the terms set forth in the proviso (or of course sell them for nonreproductive purposes under the crop exemption).

It remains to discuss one final feature of the proviso authorizing limited sales for reproductive purposes. The proviso allows sales of saved seed for replanting purposes only between persons "whose primary farming occupation is the growing of crops for sale for other than reproductive purposes." The Federal Circuit, which rejected the proposition

---

[5] For crops such as soybeans, in which the seed and the harvest are one and the same, this will mean enough seeds for one year's crop on that acreage. Since the germination rate of a batch of seed declines over time, the soybean farmer will get the year-after-next's seeds from next year's harvest. That is not so for some vegetable crops, in which the seed is not the harvest, and a portion of the crop must be permitted to overripen ("go to seed") in order to obtain seeds. One of the *amici* in the Court of Appeals asserted (and the parties before us did not dispute) that it is the practice of vegetable farmers to "grow" seeds only every four or five years, and to "brown bag" enough seed for four or five future crops. A vegetable farmer who sets aside protected seed with subsequent replantings in mind, but who later abandons his plan (because he has sold his farm, for example), would under our analysis be able to sell all his saved seed, even though it would plant (in a single year) four or five times his current acreage.

that the only seed sellable under the exemption is seed saved for the farmer's own replanting, sought to achieve some limitation upon the quantity of seed that can be sold for reproductive purposes by adopting a "crop-by-crop" approach to the "primary farming occupation" requirement of the proviso. "[B]uyers or sellers of brown bag seed qualify for the crop exemption," it concluded, "only if they produce a larger crop from a protected seed for consumption (or other nonreproductive purposes) than for sale as seed." 982 F. 2d, at 490. That is to say, the brown-bag seller can sell no more than half of his protected crop for seed. The words of the statute, however, stand in the way of this creative (if somewhat insubstantial) limitation. To ask what is a farmer's "primary farming occupation" is to ask what constitutes the bulk of his total farming business. Selling crops for other than reproductive purposes must constitute the preponderance of the farmer's business, not just the preponderance of his business in the protected seed. There is simply no way to derive from this text the narrower focus that the Federal Circuit applied. Thus, if the quantity of seed that can be sold is not limited as we have described—by reference to the original purpose for which the seed is saved—then it is barely limited at all (*i. e.*, limited only by the volume or worth of the selling farmer's total crop sales for other than reproductive purposes). This seems to us a most unlikely result.

\* \* \*

We hold that a farmer who meets the requirements set forth in the proviso to §2543 may sell for reproductive purposes only such seed as he has saved for the purpose of replanting his own acreage. While the meaning of the text is by no means clear, this is in our view the only reading that comports with the statutory purpose of affording "adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties." 7 U. S. C. §2581. Because we find the sales here were un-

lawful, we do not reach the second question on which we granted certiorari—whether sales authorized under § 2543 remain subject to the notice requirement of § 2541(6).

The judgment of the Court of Appeals for the Federal Circuit is

*Reversed.*

JUSTICE STEVENS, dissenting.

The key to this statutory puzzle is the meaning of the phrase, "as a step in marketing," as used in 7 U. S. C. § 2541(a)(3) (1988 ed., Supp. V). If it is synonymous with "for the purpose of selling," as the Court holds, see *ante*, at 188, then the majority's comprehensive exposition of the statute is correct. I record my dissent only because that phrase conveys a different message to me.

There must be a reason why Congress used the word "marketing" rather than the more common term "selling." Indeed, in § 2541(a)(1), contained in the same subsection of the statute as the crucial language, Congress made it an act of infringement to "sell the novel variety." Yet, in § 2541(a)(3), a mere two clauses later, Congress eschewed the word "sell" in favor of "marketing." Because Congress obviously could have prohibited sexual multiplication "as a step in selling," I presume that when it elected to prohibit sexual multiplication only "as a step in marketing (for growing purposes) the variety," Congress meant something different.

Moreover, as used in this statute, "marketing" must be narrower, not broader, than selling. The majority is correct that one meaning of "marketing" is the act of selling and all acts preparatory thereto. See *ante*, at 187. But Congress has prohibited only one preparatory act—that of sexual multiplication—and only when it is a step in marketing. Under the majority's broad definition of "marketing," prohibiting sexual multiplication "as a step in marketing" can be no broader than prohibiting sexual multiplication "as a step in selling," because all steps in marketing are, ultimately, steps

in selling. If "marketing" can be no broader than "selling," and if Congress did not intend the two terms to be coextensive, then "marketing" must encompass something less than all "selling."

The statute as a whole—and as interpreted by the Court of Appeals—indicates that Congress intended to preserve the farmer's right to engage in so-called "brown-bag sales" of seed to neighboring farmers. Congress limited that right by the express requirement that such sales may not constitute the "primary farming occupation" of either the buyer or the seller. Moreover, § 2541(a)(3) makes it abundantly clear that the unauthorized participation in "marketing" of protected varieties is taboo. If one interprets "marketing" to refer to a subcategory of selling activities, namely, merchandising through farm cooperatives, wholesalers, retailers, or other commercial distributors, the entire statute seems to make sense. I think Congress wanted to allow any ordinary brown-bag sale from one farmer to another; but, as the Court of Appeals concluded, it did not want to permit farmers to compete with seed manufacturers on their own ground, through "extensive or coordinated selling activities, such as advertising, using an intervening sales representative, or similar extended merchandising or retail activities." 982 F. 2d 486, 492 (CA Fed. 1992).

This reading of the statute is consistent with our time-honored practice of viewing restraints on the alienation of property with disfavor. See, e. g., Sexton v. Wheaton, 8 Wheat. 229, 242 (1823) (opinion of Marshall, C. J.).* The seed at issue is part of a crop planted and harvested by a farmer on his own property. Generally the owner of per-

---

*"It would seem to be a consequence of that absolute power which a man possesses over his own property, that he may make any disposition of it which does not interfere with the existing rights of others, and such disposition, if it be fair and real, will be valid. The limitations on this power are those only which are prescribed by law." Sexton v. Wheaton, 8 Wheat., at 242.

sonal property—even a patented or copyrighted article—is free to dispose of that property as he sees fit. See, *e. g.,* *United States* v. *Univis Lens Co.,* 316 U. S. 241, 250–252 (1942); *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339, 350–351 (1908). A statutory restraint on this basic freedom should be expressed clearly and unambiguously. Cf. *Deepsouth Packing Co.* v. *Laitram Corp.,* 406 U. S. 518, 530–531 (1972). As the majority recognizes, the meaning of this statute is "by no means clear." *Ante,* at 192. Accordingly, both because I am persuaded that the Court of Appeals correctly interpreted the intent of Congress, and because doubts should be resolved against purported restraints on freedom, I would affirm the judgment below.