T.C. Summary Opinion 2011-117

UNITED STATES TAX COURT

THOMAS G. ROSE, SR., AND CHERYL G. ROSE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15061-10S.               Filed October 4, 2011.

<u>Vincent F. Heuser, Jr.</u>, for petitioners.

<u>Diana N. Wells</u>, for respondent.

RUWE, <u>Judge</u>:  This case was heard pursuant to the provisions
of section 7463[1] of the Internal Revenue Code in effect when the
petition was filed.  Pursuant to section 7463(b), the decision to

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code as amended and in effect for the years
at issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies of $25,574 and $16,556 in petitioners' Federal income taxes for 2006 and 2007, respectively. The only issue for decision is whether petitioners are entitled to mortgage interest deductions of $73,066 and $67,489 for the taxable years 2006 and 2007, respectively, related to real estate in Fort Myers Beach, Florida.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioners resided in Kentucky.

In late 2005 petitioners began searching for property along the Florida coastline upon which they could build a vacation house. In January 2006 petitioners entered into a contract for the purchase of beachfront property in Fort Myers Beach, Florida, for $1,575,000 (property). At the time that petitioners entered into the contract there was an existing house on the property. Petitioners purchased the property in order to build a new house on the lot and not because they intended to make use of the existing house. The purchase contract provided that the existing

house would be torn down and completely removed from the property before the closing date.

Petitioners borrowed $1,260,000 from Fifth Third Mortgage Co. to facilitate their purchase of the property. The loan was secured by a mortgage on the property. On March 6, 2006, the parties closed on the purchase of the property. At the time of closing, the demolition work had been completed and the property consisted of a vacant lot.

In order to build a new house on the property, petitioners were required to obtain a construction permit from the Florida Department of Environmental Protection (department). The department requires the completion of a lengthy permitting process whenever someone seeks to build on beachfront property. The process requires that applicants exhibit that the proposed building meets hurricane and flood standards, among other requirements. As part of this lengthy process, petitioners were required to submit numerous items to the department, including detailed survey work and core drilling samples. During 2006 after the existing house had been demolished, petitioners had the required survey work done and core samples taken. Additionally, during 2006 petitioners began working with a team of building professionals that included architects, engineers, and designers. That work continued during the time petitioners were readying their permit application.

As part of the process of building a new house on the property, petitioners contacted Damon Warfel, president of Damon Custom Structures, Inc. (DCS), about performing the construction work. By early January 2007 petitioners had entered into a preliminary administration and coordination agreement with DCS. The purpose of the agreement was to coordinate the work that was being done by the project's architects, engineers, designers, and any other members of petitioners' "permitting team". In furtherance of their duties, the architect and engineer members of the permitting team prepared detailed construction and site plans for petitioners' and DCS' use during 2006 and 2007. As part of their agreement, DCS agreed to aid petitioners in acquiring approval from the department to build a single-family residence on the property. After the agreement was signed, DCS instructed members of petitioners' permitting team to continue with their preparatory activities so that the application for a building permit could be assembled and submitted to the department for approval. The permitting team's activities continued at least until the time at which the application became complete.

On June 25, 2007, petitioners filed the application for a permit for construction (application) with the department. Before the application was filed, petitioners completed the lengthy process of satisfying the various documentary

requirements that the department mandated should accompany an initial permit application. Petitioners were required to submit numerous items to the department along with their initial application, including, but not limited to: (1) Evidence of ownership and a legal description of the property; (2) written evidence from an appropriate governmental agency indicating that the proposed construction would not contravene setback requirements or zoning codes; (3) engineering design computations for any waste discharge; (4) two copies of a signed and sealed survey of the property; (5) two copies of detailed final construction plans signed by a licensed engineer or architect; (6) two copies of a dimensioned detailed site and grading plan; and (7) two copies of detailed planting plans. The work necessary to satisfy the permit application's documentary requirements began in 2006, before the signing of the DCS preliminary administration and coordination agreement, and continued throughout 2007.

On July 25, 2007, petitioners signed a form titled "Damon Custom Structures, Inc. Owner/Contractor Building Contract". The building contract reflected the particulars involved with the construction of the planned residence, as had been determined by the previous efforts of petitioners and their architects, engineers, interior designers, and landscape design specialists. The contract also provided that its enforceability was contingent

on petitioners' ability to procure construction financing for the project, on terms that petitioners found acceptable.  The final price for the work to be performed by DCS under the contract was $1,961,548.64.

Petitioners were notified that the department considered their application to be complete as of September 27, 2007.  After petitioners submitted their permit application, the department contacted them on several occasions in the following months to clarify various issues with their application.  The department's requests for clarification led to the permitting process taking longer than initially expected.  One of the key issues the department inquired about dealt with making sure that the lighting on the house would meet the department's turtle nesting requirements.  The department wanted to determine that the lighting scheme for the project would not interfere with sea turtle nesting and hatchling turtles.  Petitioners complied with the department's continued requests for clarification and waived several of the department's own mandatory decision deadlines, on the basis of their understanding that the application would be denied if they failed to cooperate and allow the department the additional time.  The department ultimately granted petitioners a construction permit on February 11, 2008, almost 2 years from the date petitioners purchased the property.

In order for petitioners to proceed with their plans to build a residence on the property, it was necessary for them to secure an additional bank loan to cover the construction costs. However, the residential real estate market in Florida had changed significantly between the time that petitioners purchased the property and the date on which the construction permit was granted. Due to the realities of a constrained credit market, petitioners were unable to secure financing that would allow them to proceed with the completion of their plan to build a residence on the property.

On June 11, 2009, petitioners sold the property for $750,000. As a result petitioners suffered an $825,000 loss on the property within 3-1/2 years from its purchase.

Petitioners filed joint Federal income tax returns for the taxable years 2006 and 2007. On their returns, petitioners deducted $87,016 and $82,201 in home mortgage interest for the taxable years 2006 and 2007, respectively. Respondent determined that the interest expense deductions claimed for the property were not qualified residence interest, and, as a result, determined deficiencies of $25,574 and $16,556 in petitioners' Federal income taxes for 2006 and 2007, respectively.

## Discussion

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Joseph v.

Commissioner, T.C. Memo. 2005-169.  Section 163(h)(1), however, provides that, in the case of a taxpayer other than a corporation, no deduction is allowed for personal interest. However, qualified residence interest is excluded from the definition of personal interest and thus is deductible under section 163(a).  See sec. 163(h)(2)(D).  Qualified residence interest is any interest that is paid or accrued during the taxable year on acquisition indebtedness or home equity indebtedness.  See sec. 163(h)(3)(A).  Acquisition indebtedness is any indebtedness secured by the qualified residence of the taxpayer and incurred in acquiring, constructing, or substantially improving the qualified residence.  See sec. 163(h)(3)(B).  Section 163(h)(4)(A)(i) defines a qualified residence as "the principal residence (within the meaning of section 121) of the taxpayer" and "1 other residence of the taxpayer which is selected by the taxpayer for purposes of this subsection for the taxable year and which is used by the taxpayer as a residence (within the meaning of section 280A(d)(1))."  For a dwelling unit to qualify as a residence pursuant to section 280A(d)(1) the taxpayer must use it for the greater of 14 days or 10 percent of the number of days during the taxable year for which the unit is rented at a fair rental price.  Sec. 280A(d)(1).  However, if the taxpayer does not rent the dwelling unit at any time during a taxable year, the unit may be treated

as a residence for the taxable year, notwithstanding section 280A(d)(1). Sec. 163(h)(4)(A)(iii).

It is undisputed that petitioners never completed the construction of a residence on the property. We have previously found that interest paid by a taxpayer in relation to a vacant lot which she and her husband owned and on which they camped yearly was not qualified residence interest within the meaning of section 163(h)(3) because the interest was not paid on a principal or second residence. See Garrison v. Commissioner, T.C. Memo. 1994-200, affd. without published opinion 67 F.3d 299 (6th Cir. 1995). However, the fact that there was no residence or dwelling unit on petitioners' property during the taxable years 2006 and 2007 does not end our inquiry. Pursuant to section 1.163-10T(p)(5)(i), Temporary Income Tax Regs., 52 Fed. Reg. 48419 (Dec. 22, 1987), a taxpayer may treat a residence that is "under construction" as a qualified residence for a period of up to 24 months if the residence becomes a qualified residence as of the time that the residence is ready for occupancy.[2] The

_____

[2]Sec. 1.163-10T(p)(5), Temporary Income Tax Regs., 52 Fed. Reg. 48419 (Dec. 22, 1987), provides:

> (5) Residence under construction.--(i) In general--A taxpayer may treat a residence under construction as a qualified residence for a period of up to 24 months, but only if the residence becomes a qualified residence, without regard to this paragraph (p)(5)(i), as of the time that the residence is ready for occupancy.

example in section 1.163-10T(p)(5)(ii), Temporary Income Tax
Regs., <u>supra</u>, clarifies that a taxpayer may treat a residence
under construction as his or her second residence for up to 24
months "commencing on or after the date that construction is
begun".[3]

We have found that petitioners purchased the property with
the intention of constructing a qualified residence and that
their actions regarding the property during the years 2006 and
2007 were in furtherance of that goal.

---

[3]Sec. 1.163-10T(p)(5)(ii), Temporary Income Tax Regs.,
<u>supra</u>, provides:

> (ii) <u>Example</u>.--X owns a residential lot suitable
> for the construction of a vacation home.  On April 20,
> 1987, X obtains a mortgage secured by the lot and any
> property to be constructed on the lot.  On August 9,
> 1987, X begins construction of a residence on the lot.
> The residence is ready for occupancy on November 9,
> 1989.  The residence is used as a residence within the
> meaning of paragraph (p)(3)(iii) of this section during
> 1989 and X elects to treat the residence as his second
> residence for the period November 9, 1989, through
> December 31, 1989.  Since the residence under
> construction is a qualified residence as of the first
> day that the residence is ready for occupancy (November
> 9, 1987) [sic], X may treat the residence as his second
> residence under paragraph (p)(5)(i) of this section for
> up to 24 months of the period during which the
> residence is under construction, commencing on or after
> the date that construction is begun (August 9, 1987).
> If X treats the residence under construction as X's
> second residence beginning on August 9, 1987, the
> residence under construction would cease to qualify as
> a qualified residence under paragraph (p)(5)(i) on
> August 8, 1989.  The residence's status as a qualified
> residence for future periods would be determined
> without regard to paragraph (p)(5)(i) of this section.

The issues we must decide are: (1) Whether the residence was "under construction" during the taxable years at issue, and, if so, (2) whether the fact that events occurred after the taxable years in issue that prevented the completion of construction of a qualified residence should disqualify the interest deduction for prior years.

Under Construction

The term "under construction" is not defined in section 163 or by section 1.163-10T(p)(5)(i), Temporary Income Tax Regs., supra, or any other related section of the regulations. As such, we must decide its proper interpretation.

Petitioners contend that the term "under construction" is broad enough to include their work done in applying for permits, doing preparatory measurements, surveying, drawing plans, and causing the existing house to be demolished and the site cleared. Petitioners encourage us to hold that the work on the property was part of the construction process and that this process began in 2006.

Respondent contends that we should interpret "under construction" much more narrowly by requiring petitioners to have begun the "physical building process" before being entitled to claim a home mortgage interest deduction. Respondent claims that petitioners' preliminary site work as part of the permitting process does not constitute construction for the purposes of

section 1.163-10T(p)(5)(i), Temporary Income Tax Regs., supra, because construction requires the act of building or putting parts together. See Black's Law Dictionary 355 (9th ed. 2009).

In order to determine the proper meaning attributable to the term "under construction" it is useful to consult the meanings ordinarily given to those words. See Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995). "Construction" is defined as "the act or process of constructing". Webster's New World College Dictionary 313 (4th ed. 2009) (emphasis added); The American Heritage Dictionary 315 (2d College ed. 1985). Furthermore, the applicable definition of "under" defines the word as "in the process of". (In fact, one of the examples given following the definition is "under construction".) Webster's Third New International Dictionary 2487 (1986); see also The American Heritage Dictionary (2d College ed. 1985). The definitions commonly attributed to both "under" and "construction" acknowledge that the terms can be read as being broad enough to encompass the entire process of construction and not simply the physical assembly of building materials. Therefore, the question becomes whether petitioners' activities during 2006 and 2007 amounted to the commencement of the process of construction rather than merely preparatory activities.

The record indicates that in early 2006 petitioners purchased the property and caused the demolition of the existing

house. Although the house was leveled and the lot was cleared before petitioners received legal title to the property in March 2006, the work would not have occurred had petitioners not bargained for it in the purchase and sale agreement. For all practical purposes, petitioners were responsible for the demolition work, and it came about as a direct result of their purchasing the property. The fact that petitioners did not hold legal title to the property at the time that the work occurred does not negate its relevance to our inquiry, especially given the real property laws of the State of Florida.[4] At the time the actual demolition and cleanup work took place with respect to the property, petitioners were possessors of equitable title. As such, petitioners were the beneficial owners of the property when the demolition of the existing house took place. Therefore, we find that by causing an entire house to be demolished and by clearing the lot so that it would be suitable for a new residence, petitioners undertook significant steps in the process of constructing their vacation house, as early as January 2006.

_____

[4]The doctrine of equitable conversion has become thoroughly ingrained and embedded in Florida real estate law. Fla. Dept. of Revenue v. Mesmer, 345 So. 2d 384, 386 (Fla. Dist. Ct. App. 1977). The doctrine of equitable conversion becomes operative upon entry of an agreement to convey title to realty. Id. The vendee immediately becomes the beneficial owner, and the vendor retains only naked legal title as security for payment of the purchase price. Id.

Such steps have been recognized as the beginning of construction.[5]

In addition to the demolition work on the existing house, petitioners also completed extensive planning and preparatory work as part of the construction permitting process. In 2006 petitioners had survey work and core drilling done on the property to satisfy permitting requirements. Petitioners also

---

[5]When discussing the enactment of sec. 189, dealing with the deductibility of construction period interest, the congressional committee stated:

The conferees understand that the construction period commences with the date on which the construction of a building or other improvement begins and ends on the date that the building or improvement is ready to be placed in service or is ready to be held for sale. * * * Generally the construction period will be considered to have commenced when land preparations and improvements, such as clearing, grading, excavation, and filling, are undertaken. However, the construction period will not be considered to have commenced solely because clearing or grading work is undertaken, or drainage ditches are dug, if such work is undertaken primarily for the maintenance or preservation of raw land and existing structures and is not an integral part of a plan for the construction of new or substantially renovated buildings and improvements. In the case of the demolition of existing structures where the construction period has not otherwise commenced, the construction period is considered to commence when demolition begins if the demolition is undertaken to prepare the site for construction. The construction period will not be considered to commence solely because of the demolition of existing structures if the demolition is not undertaken as part of a plan for the construction of new or substantially renovated buildings or improvements. [H. Conf. Rept. 97-760, at 1264 (1982), 1982-2 C.B. 600, 608; emphasis added.]

entered into a contract with DCS during 2007 so that it could coordinate and administer their ongoing permitting efforts. As a part of that agreement, DCS agreed to arrange the work that was being done by the architects, engineers, designers, and other members of petitioners' permitting team. This work had to be completed by petitioners before they could file a complete application with the department. The application required petitioners to provide evidence of ownership, governmental reassurances, engineering computations, surveys of the property, and detailed construction, site, and planting plans. The work petitioners were required to complete before filing the application was extensive and required the labor of multiple building and design professionals. This work took place throughout 2006 and 2007. Petitioners undertook significant work in preparing to obtain a construction permit, and that work was a necessary component of the overall process of construction. We hold that the property was "under construction" as a residence during 2006 and 2007.

Subsequent Events That Prevented Completion of a Qualified Residence

Respondent contends that because petitioners sold the property in 2009 before completion of a residence that was ready for occupancy, petitioners failed to satisfy the requirement that the property must become a qualified residence as of the time the residence is ready for occupancy. See sec. 1.163-10T(p)(5)(i),

Temporary Income Tax Regs., supra.  We find this contention
unpersuasive.  Section 1.163-10T(p)(5)(i) and (ii), Temporary
Income Tax Regs., supra, allows qualified residence interest to
be deducted for the 24-month period following the commencement of
construction.  In the event the residence under construction has
not been completed and is not ready for occupancy by the end of
the 24-month period, the residence under construction ceases to
qualify under paragraph (p)(5)(i) after that 24-month period
ends.[6]  If petitioners intended to claim the deduction for
qualified residence interest during the construction period, they
had to claim it on their returns for the years immediately
following the commencement of construction in January 2006.  It
is a well-known principle that each taxable year stands alone and
is evaluated separately.  United States v. Lewis, 340 U.S. 590
(1951); Rose v. Commissioner, 55 T.C. 28, 32 (1970).  In
evaluating each year on its own, it would be impossible for

---

[6]Although the example in sec. 1.163-10T(p)(5)(ii), Temporary
Income Tax Regs., supra, provides that a residence under
construction ceases to qualify under par. (p)(5)(i) for periods
beyond the end of the 24-month period, it also provides that the
ongoing construction of a qualified residence beyond that period
does not affect a taxpayer's right to claim the deduction for the
entire 24 months.  The example describes a situation where
construction began on Aug. 9, 1987, and the residence did not
become ready for occupancy until Nov. 9, 1989.  The regulation
acknowledges that the fact that the residence was not ready for
occupancy until more than 24 months had passed from the date that
construction began had no bearing on the taxpayer's ability to
claim the deduction for the first 24 months of the construction
period.

petitioners or the Internal Revenue Service to have known that the proposed residence would never become ready for occupancy.[7] The appropriateness of the deductions petitioners claimed should be evaluated on the basis of the facts and circumstances as they existed in 2006 and 2007. Events beyond petitioners' control occurred in subsequent years and prevented petitioners from completing a residence.

We hold that petitioners' planned residence was under construction during 2006 and 2007 for the purpose of section 1.163-10T(p)(5)(i), Temporary Income Tax Regs., supra. Therefore, petitioners are entitled to the claimed mortgage interest deductions for the taxable years 2006 and 2007.

To reflect the foregoing,

Decision will be entered for petitioners.

---

[7]Indeed, the regulation does not recognize that the residence under construction became a qualified residence within a specified period and does not address the situation where the residence under construction never becomes ready for occupancy. The regulation requires only that the residence "becomes a qualified residence * * * as of the time that the residence is ready for occupancy." Sec. 1.163-10T(p)(5)(i), Temporary Income Tax Regs., supra.