MONSANTO COMPANY, Plaintiff,

v.

William L. STRICKLAND, Defendant.

Civil Action No. 4:05–3062–RBH.

United States District Court,
D. South Carolina,
Florence Division.

Feb. 9, 2009.

---

Allen Jackson Barnes, Sowell, Gray, Stepp and Laffitte, Columbia, SC, Daniel C. Cox, Jeff A. Masson, Raymond Lee

Massey, Thompson Coburn, St. Louis, MO, for Plaintiff.

Everett J. Mercer, Miles Law Firm, Sumter, SC, Robert E. Lee, McLain Law Firm, Florence, SC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

R. BRYAN HARWELL, District Judge.

This is an action for patent infringement. Liability was established by virtue of the defendants' failure to file objections to the Report and Recommendation issued by Magistrate Judge Rogers. This court subsequently denied by Order of December 3, 2008 the plaintiff's motion for summary judgment on the issue of damages. The parties agreed to waive a trial by jury on damages and submitted that issue to this Court.

A damages hearing was held on January 5, 2009. Present at the hearing were Jackson Barnes, Daniel C. Cox, and Jeff Masson on behalf of the plaintiff, Monsanto, and Everett J. Mercer and Robert Lee on behalf of the defendant, Mr. Strickland. The Court heard testimony by Dr. Timothy Taylor, the plaintiff's expert, as well as testimony by the defendant. The plaintiff was instructed to file any additional information regarding its request for attorney's fees by January 9, 2009 and the defendant was ordered to file any response by January 16, 2009.

Having heard the testimony of the witnesses, considered all of the evidence, including previous findings by this Court, and the applicable law the Court makes the following Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

### I. *INTRODUCTION AND PREVIOUS FINDINGS AND CONCLUSIONS*

Prior to the January 5, 2009 damages trial, this Court adopted certain findings made by Magistrate Judge Thomas E. Rogers III on August 20, 2007. *See also,* Order, dated December 3, 2008 (Docket Entry # 163). Those findings included the following undisputed facts:

1. Monsanto developed a new plant biotechnology which is embodied in Roundup Ready® soybeans. This technology is protected by several United States patents including U.S. Patent No. 5,352,605 ... The claims of the '605 patent are drawn to a chimeric gene which is expressed in plant cells, comprising a promoter element, which can be a 35S promoter from Cauliflower Mosaic Virus (CaMV) and a structural sequence which is heterologous with respect to the promoter. (See '605 patent abstract; Affidavit of Dr. L. Curtis Hannah ("Hannah Aff.") ¶ 22, Exhibit A).

2. Roundup Ready® soybeans were commercially introduced in 1996. All Roundup Ready® soybean seeds sold in the United States since 1996 were sold pursuant to a limited used license which explicitly prohibits an authorized purchaser from saving harvested seed for use as planting seed for a subsequent crop. (Affidavit of Eloy R. Corona ("Corona Aff."), ¶ 5 attached as Exhibit B [to Plaintiff's Motion] ).

3. All seed bags containing Roundup Ready® soybean seed sold by Monsanto or its seed partners since the product was first introduced in 1996 were marked with notice that the seed was patented. (Corona Aff., ¶ 6, Exhibit B). In particular, each bag stated that the seed was protected by U.S. Patent No. 5,352,605. (Id.) A color photocopy of an exemplar Hartz soybean seed bag setting forth the required statutory notice of patent protection is attached to Mr. Corona's Affidavit. The seed bag label also warns: "A license must first be obtained from Monsanto Company before these seeds can be used in any way." Id.

4. Defendant purchased 463 units of Hartz branded Roundup Ready® soybean seed and 51 units of Delta Pine and Land branded Roundup Ready® soybean seed in May and June 2004. (Affidavit of William Harold Thompson ("Thompson Aff."), ¶ 8 Exhibit C).

5. Defendant used soybean seed packaged in plain brown bags, i.e. saved seed, to plant his 2005 crop. (Thompson Aff., ¶ 4, Exhibit C.) Roundup Ready® soybean seed is not sold commercially in plain brown bags. (Corona Aff. ¶ 8, Exhibit B; Thompson Aff. ¶ 8, Exhibit C). Monsanto and its seed partners place brand names, trademarks, patent statements and logos on their seed bags. In addition, the Roundup Ready® logo is placed on all commercial bags of Roundup Ready® soybean seed sold in the United States. (Corona Aff., ¶ 8). The typical seed bag is multicolored. For example the Hartz seed bag is green and white with black labeling. (Corona Aff. ¶ 8, Exhibit B; also see Exhibit 2 attached to Corona Aff.).

6. Monsanto filed suit for patent infringement on or about October 28, 2005. Monsanto alleged that the Defendant, William L. Strickland, planted his 2005 soybean crop using saved Roundup Ready® soybean seed in contravention of Monsanto's patent rights. (Complaint, ¶ 15).

7. On November 16, 2005, Monsanto inspected and sampled 442.2 acres as indicated by FSA records on which a soybean crop was produced by Defendant in 2005. (Affidavit of Donald D. Harlan ("Harlan Aff.") ¶ 2, Exhibit D). The soybean samples were collected at random from each field in a pattern designed to represent all areas of the fields. (Id.). Thirty-five fields were sampled. (Id. at ¶ 5). Mr. Strickland identified each of the fields to the sampling team. (Id. at ¶ 2).

8. The samples collected from Defendants fields were shipped to Biolab Solutions where the soybean samples were an-alyzed for the presence of the CP4 EPSPS protein by ELISA. (Harlan Aff., ¶ 2, Exhibit D; Affidavit of Brian Ojala ("Ojala Aff."), ¶ 4, Exhibit E). ELISA is an immunoassay methodology used to analyze for the CP4 EPSPS protein. If the sample tests positive for the CP4 EPSPS protein, the sample is Roundup Ready®. (Hannah Aff., ¶¶ 15, 16, 20, Exhibit A; Harlan Aff., ¶ 3, Exhibit D; Ojala Aff., ¶ 2, Exhibit E).

9. Approximately 35 fields, as sampled by the sampling team, totaling 442.2 acres of soybeans were sampled. (Harlan Aff., ¶ 5, Exhibit D). A total of 83 field samples and 3 soybean samples collected from Mr. Strickland's combine were analyzed. All 86 samples tested positive by ELISA for the CP4 EPSPS protein unique to Roundup Ready® soybeans. (Hannah Aff., ¶¶ 14–16, Exhibit A; Harlan Aff., ¶ 5, Exhibit D; Ojala Aff., ¶ 4, Exhibit E).

10. A DNA technique called Polymerase Chain Reaction (PCR) confirmed that the patented construct found in Monsanto's Roundup Ready® soybeans was also found in soybean samples collected from Defendant's fields in 2005. Fourteen samples collected from 8 fields and 1 combine sample were tested by PCR. (Hannah Aff., ¶¶ 17–18, Exhibit A). The CaMV 35S CP4 construct protected by the '605 patent was detected in all 14 samples. (Hannah Aff., ¶ 18, Exhibit A).

11. The DNA sequence of one PCR product was examined in a third test. The DNA sequence of the Strickland sample matched the DNA sequence of Monsanto's patented chimeric CaMV 35S CP4 construct, including the 35S CaMV promoter, a chloroplast transit peptide, and an EPSPS enzyme coding sequence. (Hannah Aff., ¶ 19, Exhibit A).

12. The soybeans obtained from William Strickland's fields in November 2005, meet all of the elements of Claims 1, 2, 4 and 5

of the '605 patent because the cells of these plants contained a chimeric gene in which the CaMV 35S promoter drives expression of a CP4 EPSPS structural sequence. Also, the CP4 EPSPS sequence is heterologous with respect to the CaMV 35S promoter. (Hannah Aff., ¶¶ 16, 18, 20, 21, 24, 25, and 26, Exhibit A).

13. Defendant did not make any authorized purchases of Roundup Ready® soybeans during the 2005 growing season. (Corona Aff., ¶ 7, Exhibit B; Thompson Aff., ¶ 7, Exhibit C).

14. Defendant's infringement of the '605 patent in 2005 was deliberate and with full knowledge of the '605 patent and with full knowledge that he would deprive Monsanto of a reasonable royalty.

15. The defendant planted at least 442.2 acres of saved Roundup Ready soybean seed without authority or license.

In its December 3, 2008 Order, this Court made the following additional findings:

1. Defendant's patent infringement was willful, and he was guilty of litigation misconduct relating to discovery. *12/3/08 Order* at 8, n.1.

2. Monsanto is entitled to a reasonable award of attorneys' fees and costs, prejudgment interest on the amount of the reasonable royalty, and some amount of enhanced damages. *12/3/08 Order* at 8.

3. Monsanto is entitled to prejudgment interest "from the date the defendant should have made a royalty payment, July 1, 2005, until the date of this Court's judgment awarding a reasonable royalty." *12/3/08 Order* at 8, n. 2.

With these findings previously made, this Court now makes the following Findings of Fact and Conclusions of Law.

## II. *FINDINGS OF FACT ON DAMAGES*

### *Reasonable Royalty*

1. At the January 5, 2008 hearing, Monsanto offered testimony from its damages expert, Dr. Timothy Taylor, on the appropriate reasonable royalty award for Defendant's infringing activity. Dr. Taylor is a professor in the Food and Resource Economics Department and Director of the Center For Agribusiness at the University of Florida. Dr. Taylor has extensive experience with crop budgets over the last 25 years. His testimony was supported by his expert report. The defendant stipulated to Dr. Taylor's qualifications as an expert witness regarding a reasonable royalty.

2. The Defendant did not offer any evidence as to an alternative calculation or method of calculating a reasonable royalty to compensate Monsanto for Defendant's infringement.

3. Although this is not dispositive, in its Opposition to Monsanto's Motion for Summary Judgment as to Damages one could interpret that Defendant may have agreed through prior counsel to Monsanto's expert's methodology and calculation of a reasonable royalty of $99.00–$101.00 *per acre*. *See* Opposition at 9 (discussing a reasonable royalty of $100/acre based on an average planting rate of 40 pounds per acre).

4. Moreover, during cross examination, the Defendant testified to his belief that a reasonable royalty of $100 *per infringing unit* (that is, $100 per 50 pounds) was fair. Transcript of Damages Hearing ("Transcript") at 86 (Docket Entry # 174).

### *Willfulness*

5. As this Court has previously determined, Defendant's infringement of the '605 patent in 2005 was deliberate and with full knowledge of the '605 patent and

with full knowledge that he would deprive Monsanto of a reasonable royalty.

6. Defendant planted saved (a/k/a second generation or "brown bag") Roundup Ready® seed in 2005. Magistrate Recommendation, at p. 3, [Docket No. 100] (incorporated by Order [Docket No. 115])

7. Defendant knew that he should not purchase the saved seed for planting his soybean crop in 2005. Strickland Depo., at 63:13–16, 67:24–25, 87:8–10. Defendant states that when he was approached to purchase the saved seed he knew it was wrong and regrets having made the purchase. *Id.* at 63:13–16 ("I thought about that and I thought I shouldn't do it, and I did, and damn it, I wish I hadn't."), 67:18–25 ("I mean, you hear other farmers talking, you know you're not supposed to save it … I knew I wasn't supposed to buy it.").

8. In fact, Defendant knew at least as early as 2003, that it was a violation of Monsanto's valid patent rights to save Roundup Ready® soybeans. Strickland Depo., at 67:18–25.

9. The Report and Recommendation of United States Magistrate Judge Thomas E. Rogers, III adopted the undisputed fact that "Defendant's infringement of the '605 patent in 2005 was deliberate and with full knowledge of the '605 patent and with full knowledge that he would deprive Monsanto of a reasonable royalty." Magistrate Recommendation, at pp. 4–5, [Docket No. 100] (incorporated by Order [Docket No. 115]).

10. Nearly 95% of South Carolina's acres of soybeans planted in 2003 were planted using herbicide resistant varieties. Nationwide, 87% of all soybean acres were planted with herbicide resistant varieties. Estimated Damages Report by Timothy Taylor, ("Taylor Report"), at pp. 1–2, Exhibit D.

11. Roundup Ready® soybeans were commercially introduced in 1996. All Roundup Ready® soybean seeds sold in the United States since 1996 were sold pursuant to a limited use license which explicitly prohibits an authorized purchaser from saving harvested seed for use as planting seed for a subsequent crop. Magistrate Recommendation, at p. 2, [Docket No. 100] (incorporated by Order [Docket No. 115]).

12. The Monsanto limited use license ("Technology Agreement") explicitly states that growers cannot save seed and cannot acquire seed from anyone other than an authorized dealer. The technology agreement also lists all valid patents that cover the Roundup Ready seeds, including the '605 patent.

13. All seed bags containing Roundup Ready® soybean seed sold by Monsanto or its seed partners since the product was first introduced in 1996 were marked with notice that the seed was patented. Magistrate Recommendation, at pp. 2–3, [Docket No. 100] (incorporated by Order [Docket No. 115]). In particular, each bag stated that the seed was protected by U.S. Patent No. 5,352,605. *Id.* The seed bag label also warns: "A license must first be obtained from Monsanto Company before these seeds can be used in any way." *Id.*

14. Roundup Ready® soybean seed is not sold commercially in plain brown bags.[1] Magistrate Recommendation, at p. 3, [Docket No. 100] (incorporated by Order [Docket No. 115]). Monsanto and its seed

---

1. Brown bag seed refers to the practice of a farmer buying commercial seed, planting the seed, harvesting the crop, cleaning the harvested crop seed and then replanting the saved seed or selling the seed to other farmers. *Cf. Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 182, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995) (Brown bags are usually provided by a seed cleaner.).

partners place brand names, trademarks, patent statements and logos on their seed bags. *Id.* In addition, the Roundup Ready® logo is placed on all commercial bags of Roundup Ready® soybean seed sold in the United States. *Id.* The typical seed bag is multicolored. For example the Hartz seed bag is green and white with black labeling. *Id.*

15. Defendant admits that farmers in South Carolina generally knew as early as 2003 that it was a violation of Monsanto's patent rights to save Roundup Ready® seed. Strickland Depo., at 43:10–44:1, 67:18–68:3.

16. For these reasons, the Court finds that Defendant knowingly infringed Monsanto's valid patent and acted with the knowledge that his conduct created an objectively high likelihood that a valid patent would be infringed.

### *Defendant's Litigation Misconduct*

17. Throughout the pendency of this litigation, Defendant has failed to respond to discovery requests until compelled by the court to act. Defendant has ignored subpoenas and has not appeared for scheduled depositions. Defendant has provided inconsistent factual assertions and refused to answer questions regarding his infringing activities. *See* Docket Nos. 26, 28, 38, 43, 46, 53 and 131.

18. Because of Defendant's failure to respond to discovery, Monsanto filed a Motion to Compel Discovery on February 28, 2006 and a Supplemental Motion to Compel on March 9, 2006. This Court then issued an order compelling Defendant to fully respond to Monsanto's discovery requests. *See* Docket Nos. 26, 28 and 38.

19. After Defendant continued to ignore the Court's order, Monsanto renewed its Supplemental Motion to Compel Discovery on May 26, 2006. The Court issued yet another order compelling Defendant to fully respond to Monsanto's discovery requests. *See* Docket Nos. 43 and 46. Finally, in July 2006, Defendant answered Monsanto's Requests for Production and Second Set of Interrogatories. *See* Strickland Interrogatory Answers, attached as Exhibit B to Monsanto's Motion for Summary Judgment as to Damages ("Monsanto's Motion").

20. In July and August 2006, Defendant failed to respond to Monsanto's requests to schedule a deposition and Monsanto was forced to select a date and scheduled the deposition for August 18, 2006. Monsanto sent a notice of deposition and a deposition subpoena to Defendant. Affidavit of Wayne K. McNeil, ("McNeil Aff."), at ¶ 3–4, attached as Exhibit F to Monsanto's Motion.

21. Only nine (9) days before the scheduled deposition, Defendant contacted Monsanto and notified them of a conflict with the scheduled deposition date. Monsanto agreed to reschedule the deposition for a mutually agreeable date and again sent Defendant a notice of deposition and deposition subpoena. *Id.* at ¶¶ 5–6.

22. Defendant failed to appear on the agreed date, and, as a result, Monsanto was forced to move the court to compel Defendant to appear for deposition. *See* Motion to Compel, [Docket No. 53]; McNeil Aff., at ¶ 7.

23. Monsanto served Defendant with another notice of deposition and deposition subpoena. On March 12, 2007, Defendant appeared for the deposition thirty (30) minutes late, and then refused to answer any questions until he was provided with photographs taken by Monsanto in their pre-suit investigation and until Monsanto answered his questions regarding same. Ultimately, Defendant left the deposition without answering any questions. McNeil Aff., at ¶¶ 10–12.

24. Finally, on December 6, 2007, after Court intervention, Defendant appeared

and was deposed by Monsanto. Defendant continued to refuse, however, to answer all questions regarding the facts surrounding his infringing conduct. Strickland Depo., at 44:21–45:25, 61:8–64:23, 68:1–70:12, 88:18–91:3. Monsanto was again forced to seek relief from this Court with yet another motion to compel Defendant's testimony. *See* Motion to Compel [Docket No. 131].

25. In addition to Defendant's continuing refusals to comply with discovery requests, Defendant's answers to written discovery were inconsistent with responses given during his deposition. *Compare* Strickland Interrogatory Answers, at No. 5 (Defendant states that all Roundup Ready® Soybean seed he planted in 2005 was carried over from purchases made in 2004) *with* Strickland Depo., at 78:7–81:11 (Defendant states that he purchased saved seed from an undisclosed source in 2005 to plant his soybean crop).

26. Defendant's evasive and dilatory acts may have resulted in the loss of the opportunity for Monsanto to pursue another infringer. Transcript of Rule to Show Cause Proceedings, ("Rule to Show Cause Proceedings"), at 12:17–13:19, [Docket No. 144] (Defendant then stated he bought the saved seed from an individual recently deceased); *see id.* at 21:6–22:9 (summary of Defendant's opportunities to provide this information earlier as well as his repeated refusals, discovery abuses, and non-compliance with court orders).

### *Attorneys' Fees and Expenses*

27. Defendant's deliberate and willful infringement and his misconduct during the litigation forced Monsanto to spend significant monies in attorneys' fees and other litigation expenses for more than three years. However, the defendant was not required to litigate the case through a jury or bench trial on the issue of liability. The only contested issues for determination by the Court after a short bench trial related to the amount of damages.

28. Monsanto indicates in its Petition for Attorney's Fees (Docket Entry # 167) that it seeks reimbursement for attorney's fees and costs paid to local counsel, Sowell Gray Stepp & Laffitte, LLC in addition to fees and costs incurred by its national counsel, Thompson Coburn, LLP. However, Monsanto indicates that it is not "seeking recovery for the fees and costs expended by its former national counsel, including those for example that were the subject of a motion to compel and for costs associated with discovery abuses ... Given the length of time which its former national counsel was involved relative to the total time this matter has been pending, this is a substantial amount of fees for which Plaintiffs are not seeking reimbursement." *See also* Declaration of Jeffrey Masson (Docket # 178–2), ¶ 7, "Plaintiffs are not seeking the recovery of fees and costs associated with the representation from the originating firm of Frilot Partridge ..." However, in letters to the Court, Plaintiff indicates that it seeks to recover a total of $402,062.19 which appears to include the Frilot billings. The letters from counsel for the plaintiff and statements made at the damages hearing indicate that the plaintiff is requesting somewhere between $377,084.13 and $402,062.19 (representing $124,038.96 from Frilot Partridge, $200,054.47 from Thompson Coburn, and $52,990.70 from local counsel). (See letters from attorney Barnes, docket entry numbers 181–183 and 187; Tr. p. 104.) No affidavit has been filed regarding the fees and costs claimed from Frilot Partridge. Nor has Mr. Masson filed an affidavit covering the additional fees and costs claimed for Thompson Coburn after the date of the initial affidavit.

29. In a letter provided to the Court after the filing of the Petition for Attorney's

Fees, Counsel for Monsanto and Strickland agreed that a reduction of $27,060.21 ($24,402.21 from Thompson Coburn 10 bills and $2658.00 from Frilot firm) from the total amount sought by Monsanto of $429,122.40 was appropriate. The letter further indicated that Monsanto reduced its total request for fees and costs to $402,062.19 (which appears to include the $124,000 figure from Frilot).

## III. CONCLUSIONS OF LAW

***Monsanto is Entitled to Damages in the Amount of a Reasonable Royalty for Defendant's Infringement of Monsanto's '605 Patent.***

1. Title 35 U.S.C. § 284 provides: "[U]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

It also provides that "the court may receive expert testimony as an aid to the determination of damages or what royalty would be reasonable under the circumstances." *Id.*

2. In the absence of an established royalty rate "[t]he royalty may be based upon ... the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1554 (Fed.Cir.1995). And the determination of a reasonable royalty is done in light of all relevant facts including those set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970) (listing fifteen (15) relevant evidentiary facts used to determine the reasonable royalty).[2] The "hypothetical negotiation" between the patentee and the infringer is a means of determining what the negotiated royalty would have been at the time infringement began. *Rite–Hite Corp.,* 56 F.3d at 1554.

3. In his report and testimony, Professor Taylor, determined that the proper

2. That court set forth fifteen (15) factors "relevant, in general, to the determination of the amount of a reasonable royalty for a patent license:" 1) The royalties received by the patentee for the licensing of the patents in suit; 2) The rates paid by the licensee for the use of comparable patents; 3) The nature and scope of the license; 4) The licensor's established policy and marketing program regarding licensing others; 5) The commercial relationship between the licensor and licensee; 6) The extent of such derivative or convoyed sales; 7) The duration of the patent and the license; 8) The established profitability of the infringing products, their commercial success, and current popularity; 9) The utility and advantages of the patent property over the old modes or devices, if any; 10) The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention; 11) The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use; 12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; 13) The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; 14) Expert testimony; 15) The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement, that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. *Georgia–Pacific Corp.,* 318 F.Supp. at 1120.

reasonable royalty in this case is between $99.00 and $101.00 per acre planted with saved Roundup Ready® soybean seed. Taylor Report, at p. 13. Dr. Taylor's determination of that reasonable royalty is based on a hypothetical negotiation between Monsanto and Defendant as presumed willing licensor and licensee. *Id.* at p. 8; Transcript at 15. Dr. Taylor's analysis is based upon the considerations outlined in *Georgia–Pacific* and focuses on the commercial success of Roundup Ready® seed technology and the importance of Monsanto protecting its patent rights. *See* Taylor Report, at p. 7–13; Transcript at 16. Considering those factors, Dr. Taylor applied the facts of this case to determine the value of a reasonable royalty for unauthorized use of Roundup Ready® soybean seed.[3] Taylor used estimated net income for the average South Carolina farmer's 2005 crop as a starting point for those negotiations. *Id.* at p. 7–12 (net income of $112.50 per acre).[4] Dr. Taylor then recommended a reasonable royalty to compensate Monsanto for the unauthorized use of the technology, set at no less than 75% of the net income from the 2005 crop plus Monsanto's costs associated with monitoring. *Id.* at 12.

4. Dr. Taylor explained that his calculation is conservative in that the starting point for the hypothetical negotiation is based on a grower who actually pays the per unit cost for authorized seed in 2005, $32.40. Transcript 40–41. The $32.40 unit costs includes an established royalty of $13.65. As Taylor explained, the infringer does not pay the $32.40 provided for in the budget set forth in at Table 1 of Dr. Taylor's report. Transcript 42. When that number is considered as part of the budget analysis, the income over variable cost (the starting point of the negotiation) would be $138.89, not $112.15. Transcript 44–45. It is also a conservative starting point because it does not include a quantification of the benefits to Monsanto for the restrictions on use of the technology. Transcript 37–39, 46.

5. The income over variable cost in Taylor's budget analysis is for Roundup Ready® soybeans following a wheat crop. Taylor Report at 9, Transcript at 43. Defendant has suggested that because the net income after variable costs includes income from wheat, the starting point for the negotiation should be below $112.15.

6. This Court rejects that argument. First, that argument does not take into consideration either the cost savings of $32.40 per unit ($26.89/acre for this infringer) or the benefits to Monsanto for the restrictions on use that are difficult to quantify but that have significant value. The $26.89 savings alone justifies an award of $83.47/acre when added to the amount now suggested by Defendant as a royalty, $56.58/acre ($26.89 + $56.58 = $83.47/acre). *See* Transcript at 55 (testifying on cross-examination, Taylor explained "that the number we used to generate $112 assumes no infringement. The numbers would actually be higher with infringement.")

7. Moreover, Defendant's infringing use of the technology in his soybean crop bene-

---

3. Eleven of the Georgia Pacific Factors weigh in favor of reasonably royalty higher than the per unit seed cost of $32.40 in 2005. Three of those factors had a neutral effect according to Dr. Taylor. The fifteenth factor is hypothetical negotiation. Transcript 17–34.

4. As Professor Taylor explained at the January 5th hearing, Table 1 in his Report, is not his calculation of the reasonable royalty for infringing conduct. That chart is a budget estimate for an average farmer in South Carolina with *authorized use* of the technology. As he testified, that chart was used a means of establishing a starting point for the hypothetical negotiation.

fited Defendant with savings in his wheat crop. Transcript at 62–63 (explaining the cost savings for wheat when double cropped with Roundup Ready® soybeans, including reduced tillage).

8. For these reasons, the Court finds that is appropriate to assume that hypothetical negotiation would start at $112.50 for this infringing Defendant who (1) did not pay the $32.40 that the average, non-infringing farmer, would pay, (2) who would deprive Monsanto of all the benefits Monsanto received for the non-infringing use, and (3) who gained additional (unspecified) cost savings for his double cropped wheat acres as a result of his infringing use of the technology.

9. The court concludes that using 75% of net income over variable cost for Monsanto's share of the income is appropriate.

10. The Court concludes it is appropriate to use $16.00/acre for Monsanto's monitoring costs associated with a one-time, hypothetical, unrestricted use license.

11. Dr. Taylor's analysis is reliable and has been accepted by and used by his peers. In *Monsanto Co. v. Joe Kyle, et al.,* Marvin L. Hayenga, whose expert report was attached to Monsanto's motion as Exhibit G, calculated a reasonable royalty of $74–104 for unauthorized use of the technology in soybeans planted after a rice crop and a reasonable royalty of $98–$138 for unauthorized use of the technology in soybeans planted *after a wheat crop,* using the same methodology as Taylor used here. Dr. Taylor's analysis is within, and at the low end of, the reasonable royalty calculation by Dr. Hayenga in *Kyle.*

12. Given the *Georgia Pacific* factors and the current environment for grain commodities, Dr. Taylor's and Dr. Hayenga's analysis, based upon a percentage of the estimated income above variable costs for soybeans, is an appropriate method for establishing a reasonable royalty calculation in this case.

13. Moreover, Dr. Taylor's alternative calculation using a pure benefits/cost methodology, which is consistent with the net income approach, is also an accepted methodology. *See Monsanto v. Ralph,* 382 F.3d 1374, 1382–84 (Fed.Cir.2004).[5] Using the benefit/cost savings methodology, for the 2005 growing season, the economic benefits received by Defendant from his infringing use include seed cost savings, yield increases, and input cost saving benefits. Transcript at 47–53.

14. Dr. Taylor quantified those benefits during his testimony. The seed cost sav-

---

5. The Federal Circuit, in *Monsanto v. Ralph,* 382 F.3d 1374 (Fed.Cir.2004), affirmed a jury verdict that awarded Monsanto $55.04/unit for the infringing activity in that case. That award was approximately 80% of the reasonable royalty calculated by Monsanto's expert for the 1999 infringement. The $55.04/unit award was based upon infringing activity in 1999, six years prior to Defendant's infringement in this case. In 1999, the established royalty or technology fee was $5.00. 382 F.3d at 1377. In 2005, the established royalty of $13.65 was more than double the 1999 fee. In 1999, the seed cost for an authorized bag/unit of Roundup Ready® soybean seed was $19.00–$22.00. *See Monsanto v. McFarling,* 488 F.3d 973, 976 (Fed.Cir.2007). As Taylor testified, the time element and increased re-

tail costs explain the increase in Monsanto's royalty calculations from those older cases. Transcript at 53. Moreover, as the Federal Circuit has noted, in those 1999 growing season cases, the juries did not consider all the relevant factors. In fact, the *McFarling* court explained that just considering two of the benefits (yield increases and economic benefits) from the costs savings analysis, an infringer grower would receive benefits up to $61 per infringing unit. Moreover, the award in those cases did not include seed cost savings, a quantification of the economic benefits to Monsanto for the restriction on use of the technology, or the monitoring cost that Monsanto would bear as a result of a hypothetical, one-time, unrestricted use license. See Transcript 115–120.

ings/acre for infringing use of the technology in 2005 is $21.50. That number is based upon: a per unit cost of $32.40, minus the commodity price of $5.43 and seed cleaning costs savings of $1.00, multiplied by the planting rate in this case, .83 lbs/acre: $32.40–$6.43 = $25.97 × .83 = $21.55. Transcript 49–50. The yield increase from use of Roundup Ready® soybeans over convention soybeans, acknowledged by the Federal Circuit, of 3 to 5 bushels/acre equates to $16.29 to $27.15 for soybeans in 2005 with a market price of $5.43. Transcript at 51. The economic benefits to the infringing farmer are approximately $37.00 in production costs savings based upon *Marra'*s, et al. 2004 study. Transcript at 51–52; Taylor Report at 5–6. When the monitoring cost is considered with these cost savings benefits methodology, Taylor's per acre estimate of a reasonable royalty calculation is $89.79–$100.65. Using this methodology, Taylor does not presume a split of net income but quantifies the costs savings and benefits to the grower as the measure of the royalty and presumes the grower would keep the income. Transcript 47–53.

15. The Court concludes that the appropriate reasonable royalty damages figure for Defendant's infringing use of Monsanto's patented invention in this matter is the average of $99.00 and $101 per acre of saved Roundup Ready® soybean seed, planted at a planting rate of 41.5 pounds per acre. As such, the total award due Monsanto is a simple multiplication of this average per acre award ($100) times the number of infringing acres Defendant planted in 2005 (442.2 acres). Monsanto is awarded $44,220.00 as damages for Defendant's infringement.

### *Prejudgment Interest*

16. Monsanto is entitled to prejudgment interest and costs pursuant to 35 U.S.C. § 284.

■ 17. Prejudgment interest is generally "awarded from the date of infringement to the date of judgment." *Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.,* 847 F.2d 795, 800 (Fed.Cir.1988). In this case, the date of infringement is July 1, 2005. *See* 12/3/08 Order at 8, n.3.

■ 18. The rate at which prejudgment interest is calculated, and whether this interest is compounded, is left to the discretion of the court. *Bio–Rad Labs., Inc. v. Nicolet Instrument Corp.,* 807 F.2d 964, 969 (Fed.Cir.1986). In exercising this discretion, however, the "court must be guided by the purpose of prejudgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.' " *Id.* (citing *Gen. Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983)).

■ 19. Thus, the Court enjoys "wide latitude" in selecting the interest rate, and may set this rate "at or above the prime rate." *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 939 F.2d 1540, 1545 (Fed.Cir.1991). Consequently, courts have applied the prime rate, the Treasury Bill rate, and interest at levels greater than the prime rate. *See Uniroyal,* 939 F.2d at 1545; *Laitram Corp. v. NEC Corp.,* 115 F.3d 947, 955 (Fed.Cir.1997); *Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Inc.,* 403 F.Supp.2d 288, 290–91 (S.D.N.Y.2005).

■ 20. The plaintiff provided to the Court at the hearing a document entitled "History of Prime Interest Rate–2005 to the Present." The content of the document was not challenged by the defendant. The closest date on the chart to the July 1, 2005 infringement date was June 30, 2005, when the prime rate was 6.25%.

21. The Court finds that the rate of 6.25% simple interest is the appropriate

interest rate. The prejudgment interest award is thus calculated as follows:

| Interest for ½ 2005 | $44,220.00 | × | .0625 divided by 2 | = | $1381.88 |
| Interest for 2006 | $44,220.00 | × | .0625 | = | $2763.75 |
| Interest for 2007 | $44,220.00 | × | .0625 | = | $2763.75 |
| Interest for 2008 | $44,220.00 | × | .0625 | = | $2763.75 |
| Interest for 2009 | $44,200.00 | × | .0625 @ 40 days | = | $ 304.01 |

Total Award of Prejudgment Interest: $9977.14

### Defendant's Willful Infringement and Litigation Misconduct Make this an Exceptional Case Entitling Monsanto To Attorneys' Fees.

■ 22. Under 35 U.S.C. § 285, a court may award reasonable attorneys' fees to the prevailing party in an "exceptional case." 35 U.S.C. § 285. An exceptional case exists when the losing party has been found to have willfully infringed the prevailing party's patent or engaged in misconduct during litigation. *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 376 (Fed.Cir.1994).

■ 23. The awarding of attorneys' fees in an exceptional case is a two-step process. *Evident Corp. v. Church & Dwight Co., Inc.*, 399 F.3d 1310, 1315 (Fed. Cir.2005). First, the court must make a factual determination of whether the case is "exceptional." *Id.* Next, the court, if having found the case to be exceptional, must then determine if awarding attorney's fees is appropriate. *Id.* This Court has already found that this case is an exceptional case given Defendant's willful infringement of Monsanto's '605 patent and Defendant's litigation misconduct. For these reasons, this Court has already determined that Monsanto is entitled to a reasonable award of attorney's fees. *See* 12/3/08 Order at 8.

■ 24. In the Fourth Circuit it has been noted that the relevant factors as to the amount of attorneys fees to be awarded are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.1978). Local Rule 54.02(A) provides that attorney's fee petitions must comply with *Barber* "and shall state any exceptional circumstances and the ability of the party to pay the fee." The United States Court of Appeals for the Federal Circuit, which hears appeals in patent cases, has noted that the amount of an award of attorney fees in patent infringement action is assessed at the discretion of the district court, but in determining the reasonableness of the award, there must be some evidence to support reasonableness of the billing rate charged and the number of hours expended. *Lam, Inc. v.*

*Johns–Manville Corp.*, 718 F.2d 1056 (Fed.Cir.1983). As a general rule, an award of attorneys' fees "may be substantial" and "the cost to the losing party of paying the attorneys' fees can be greater than the cost of paying the actual judgment awarded on the merits." *Moore v. City of Des Moines*, 766 F.2d 343, 345 (8th Cir.1985). Both the *Barber* Factors and those utilized by courts in patent cases go to an inquiry by the court as to what is reasonable under the circumstances.

25. Regarding the time and labor expended, St. Louis counsel for the plaintiff indicates in his Declaration that his current hourly rate is $230 and that Thompson Coburn had billed the plaintiff $177,828 in fees and $7407.44 in costs as of January 4, 2009. Local counsel indicated by letter that the Thompson Coburn firm was owed $224,456.68 in fees and costs as of January 12, 2009. The letter does not itemize the portion of that bill for fees as opposed to costs and no updated affidavit was submitted from counsel regarding the additional fees. A subsequent letter from local counsel indicates that the parties agreed to reduce the Thompson Coburn bill by $24,402.21 representing fees and costs by Mr. Masson where a firm partner, Dan Cox, also participated. No affidavit has been filed by Mr. Cox for his time, although the firm's detailed invoice has been provided to the Court under seal. The invoice indicated that a total of $204,901.50 in fees for 812.9 hours of time [6] was billed in addition to $19,555.18 in costs. The affidavit of Masson does not indicate the number of hours he personally devoted to the case. The Court has also not been provided with information as to the amount of fees as opposed to costs which make up the reduction of $24,402.21.

Local counsel filed an affidavit in which he avers that he is a partner in the firm of Sowell Gray and that his current hourly rate is $260. He indicates that he has billed the plaintiff $48,568 in fees and $4422.70 in costs for a total bill of $52,990.70. The invoices reflect time from Mr. Barnes and a paralegal at various hourly rates since 2005 but do not appear to contain a total number of hours billed nor a breakdown of total hours attributed to him versus his paralegal at different hourly rates without the court going through each and every invoice and attempting to compute the same.

With regard to factors (2) and (3) above, the issues set forth in this case are neither particularly novel nor difficult in the context of patent litigation dealing with agriculture biotechnology, but such field is, due to its very technical nature, beyond the realm of many litigators. Accordingly there is little opportunity lost to national counsel, who actually enhances its relationship with Plaintiffs by its involvement herein. As for local counsel, this matter does not amount to a significant loss in opportunity. Accordingly, factor (4) does not figure prominently in the analysis herein. Factor (11) is also subsumed within this analysis, in as much as Monsanto selects its counsel and works with them on a number of cases to leverage its relationship with counsel. Factor (6) which deals with the attorney's expectations is not so relevant in this context inasmuch as counsel has been paid all along, unlike a contingent fee arrangement. Factor (7) which deals with time limitations imposed by circumstances, in part, is relevant. The discovery abuses caused by Defendant contributed to some extent to the amount of the fees incurred by the plaintiff in this

---

**6.** The invoices contain names of various individual timekeepers but do not indicate whether the individuals are paralegals or attorneys.

case. However, the problems dealing with the defendant's lack of responsiveness to discovery did not require expertise beyond that of a typical litigator. Regarding Factor (8), counsel for Plaintiffs have obtained excellent results, although Mr. Strickland did not have counsel during the majority of the case and it was not necessary for the plaintiff's counsel to research or contest matters pertaining to liability. The amount awarded, however, is far less than the fee requested. The experience of counsel Factor (9) is set forth in the Declarations. There is nothing undesirable about representing Plaintiff Monsanto. Factor (10) is, therefore, not applicable to the Court's analysis in this case. With regard to the customary fee for similar work, no evidence has been presented from other attorneys in the field. Mr. Masson does aver that his firm's hourly rates are comparable with the rates of other similar St. Louis firms.

The court is aware that the field of patent law requires specialized knowledge and finds that the hourly rate of Mr. Masson of $230 per hour is reasonable for the patent work on the case. Plaintiff chose to use two law firms, one in-state and one out-of-state. Plaintiff is entitled to some reasonable fees and the determination of the fair amount of fees to award varies from case to case based on the circumstances. Much of the work done on the case did not require the expertise of a patent lawyer but general litigation expertise. During much of the time, the defendant was even proceeding *pro se.* Additionally, neither lawyer submitted affidavits of other lawyers supportive of their hourly rates and the lawyer with patent experience had a lower hourly rate than local counsel. To award over $400,000 in attorney's fees in a case such as this is beyond reason and far beyond reasonable. Clearly, Plaintiff is entitled to some amount. The Court does not discourage parties from seeking reasonable

attorney's fees when they are legally entitled to them. However, simply because one is entitled to attorney fees in a particular case does not mean that common sense in terms of a reasonable amount to award goes out the window. In this case, using the plaintiff's own expert, the reasonable royalty amount was around $44,000. Yet, they have incurred over $400,000 in attorney fees and costs, almost ten times the amount of a reasonable royalty. One of the two law firm's time was for over 800 hours (the equivalent of about 5 months or 20 weeks at 40 hours per week). In a case that the defendant was *pro se* much of the time, did not go to trial on liability, and included a half-day nonjury hearing on damages, and when the defendant did have counsel they were not patent lawyers, it is difficult to justify awarding such a large amount of attorney fees.

26. After review of the pertinent factors outlined above and the submissions by the parties, and regardless of whether the plaintiff seeks the full amount of the fees by the former national counsel, the Court concludes that an appropriate and reasonable amount to award to Monsanto as reasonable attorney's fees is $44,200 plus costs in the amount of $19,555.18. This was not a complex patent case, and the case did not result in a jury or bench trial on the liability issues but only a bench trial on damages. However, the defendant did make it difficult to obtain the results achieved with his uncooperative behavior. The Court believes that the defendant should not have to pay a larger fee than the case deserves due to plaintiff's decision to utilize several attorneys to work on the case. The Court believes that an award of $44,200 is a fair award considering the nature of the work required and the results achieved. It is a reasonable amount to award after considering all the facts and circumstances in the case and the factors

in the Fourth Circuit and the Federal Circuit. The Court is aware that it could award attorney's fees much higher than the damages awarded but believes that this would not be warranted under the circumstances of this case.

*Monsanto is Entitled to Enhanced Damages Pursuant to 35 U.S.C. § 284*

27. When there is willful infringement, the court may "increase damages *up to* three times the amount found or assessed." 35 U.S.C. § 284 (emphasis added).

 28. While the court may consider all relevant facts showing the culpability or lack thereof of the defendant, the court in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir.1992) set forth nine (9) factors that may be useful to this analysis. *Id.* at 826–27. However, "a finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." *Id.* at 827.

 29. The *Read Corp.* factors support an enhanced damages award of one (1) times assessed damages:

1) Defendant "copied" Monsanto's patented design;

2) Defendant knew the seed was patented and that he was not supposed to purchase saved seed for planting;

3) Defendant has not complied with discovery requests and skipped depositions, only complying after being compelled to do so by the Court.

4) The Court has questions concerning the extent of the defendant's assets. Plaintiff's counsel stated at the hearing, in opposition to defendant's request to be allowed to submit current financial statements, that Strickland's financial picture "wasn't that great when we took his deposition the first time, and it wasn't that great when we submitted it as part of our papers originally." (Tr. p. 122). Counsel

for Strickland stated at the hearing that this case may result in his client's bankruptcy. (Tr. p. 121)

5) This case is not "close" as Monsanto has ample evidence establishing Defendant's infringing acts;

6) Defendant's infringement was for the entire 2005 growing season;

7) There is no evidence that Defendant took any remedial action;

8) Defendant was likely motivated to purchase the saved seed to reduce his costs and he admits that he 22 knew purchasing the seed was wrong;

9) Defendant has attempted to conceal facts regarding his infringement by providing incomplete discovery responses, failing to show up for depositions, and refusing to identify from whom he purchased his seed until three (3) months after the individual passed away.

30. In this case, most of the factors weigh in favor of enhanced damages. This Court awards Monsanto enhanced damages in the amount of one (1) times the reasonable royalty, $44,220. The court notes the defendant did not file objections to the Report and Recommendation and consented to a bench trial on damages. The Court believes that one times the reasonable royalty is appropriate as enhanced damages.

## IV. CONCLUSION

WHEREFORE, the Court enters judgment against Defendant as follows: $44,220 for royalty damages; prejudgment interest at 6.25% simple interest on the royalty damage award; $44,200 for Monsanto's attorneys' fees in addition to $19,555.18 in costs; and $44,220.00 for enhanced damages.

**AND IT IS SO ORDERED.**

JUDGMENT IN A CIVIL CASE

[X] **Decision by the Court.** This action came to hearing before the court, the Honorable R. Bryan Harwell, United States District Judge presiding. The issues have been heard and the Court having entered judgment in favor of the plaintiffs Monsanto Company and Monsanto Technology, LLC and against the defendant William L. Strickland;

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of the plaintiffs Monsanto Company and Monsanto Technology, LLC, in the amount of Forty–Four Thousand, Two Hundred and Twenty and 00/100 ($44,220.00) for royalty damages with prejudgment interest at 6.25% simple interest on the royalty damage award.

It is further ordered that Monsanto Company and Monsanto Technology, LLC, are awarded Forty–Four Thousand, Two Hundred and 00/100 ($44,200.00) for attorney's fees in addition to Nine–Teen Thousand, Five Hundred Fifty–Five and 00/18 ($19,555.18) in costs and Forty–Four Thousand, Two Hundred and Twenty and 00/100 ($44,220.00) for enhanced damages.